IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT NASHVILLE

FILED

October 20, 1995

Cecil Crowson, Jr.
Appellate Court Clerk

CHARLES K. NEWSOM,

     Plaintiff-Appellant,

Vs.

TEXTRON AEROSTRUCTURES,
a division of Avco, Inc.; and
GARY L. SMITH, Individually,

     Defendants-Appellees.

Davidson Chancery #91-2622-I
C.A. No. 01A01-9504-CH-00151

FROM THE CHANCERY COURT OF DAVIDSON COUNTY

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

H. Rowan Leathers III of Manier, Herod,
Hallabaugh & Smith of Nashville
For Appellant

Robert E. Boston and Stephen W. Grace of Nashville
For Appellees

AFFIRMED

Opinion filed:

W. FRANK CRAWFORD, PRESIDING
JUDGE, W.S.

CONCUR:

DAVID R. FARMER, JUDGE

WILLIAM C. KOCH, JR., JUDGE

This appeal involves a suit brought by an employee against his employer asserting that the employer's actions, in connection with the employee's demotion and subsequent termination, violated The Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Tennessee Human Rights Act (THRA), T.C.A. § 4-21-101 (1991), *et. seq.* The employee also alleges that the employer's actions in connection with the demotion and termination were slanderous and constituted outrageous conduct. Plaintiff employee, Charles K. Newsom, appeals from the order of the trial court granting summary judgment to defendant, Textron Aerostructures, Inc., and Gary Smith,[1] and the only issue on appeal is whether the trial court erred in so doing. The pertinent facts are as follows.

The plaintiff, Charles K. Newsom, was born February 14, 1933. Defendant Textron Aerostructures is in the business of manufacturing aircraft parts and other large machinery for both private buyers and the defense industry. Newsom was employed by defendant Textron on September 23, 1957, as an at-will employee, and he worked at Textron for thirty-four years until he was discharged on March 27, 1992.

During the course of Newsom's employment at Textron he received regular promotions, satisfactory performance evaluations, work commendations, and pay increases. Newsom eventually obtained a management position and in April of 1988 he was promoted to the position of Senior Compliance Analyst (SCA). As SCA Newsom was responsible for reviewing the "procurement packages" of Textron "buyers" and insuring that Textron's procurement of tools and other parts to be used in contracts with the federal government complied with federal regulations controlling government contracts. Textron created the

---

[1]Plaintiff stipulates in his brief that he does not appeal the dismissal as to defendant Gary Smith.

SCA position in order to ensure that Textron successfully passed government contract "procurement audits" which were performed by agencies of the federal

government.[2]  One of the major audits Textron was required to undergo  was a Contractor Procurement System Review (CPSR).

To ensure that Textron would successfully pass its scheduled CPSR in November of 1989, Textron performed a "pre-CPSR" in April of 1989. A "pre-CPSR" is Textron's own internal audit of its buyers procurement packages.[3]  The results of the April, 1989 "pre-CPSR" showed deficiencies in seventy percent of the buyer packages, and in Newsom's words the results were "not good."  Following the CPSR, Newsom was suspended without pay for a period of one week. Subsequently, on August 10, 1989, Newsom was notified that he was being demoted from SCA into the position of Buyer II.  Newsom's successor as Senior Compliance Analyst was Sherry Ritchie, a female under the age of forty.   On August 30, 1989, Newsom was evaluated pursuant to Textron's annual employment evaluation policy, and he was informed at that time that he was demoted because his performance in the position of SCA was unsatisfactory. In the August 30, 1989 performance review, Textron stated that it demoted Newsom, because he did not "meet the position requirements for a Senior Compliance Analyst."  The basis asserted by Textron for Newsom's deficient performance was his performance in the pre-CPSR in April, 1989.  Newsom contends that he was demoted because of his age.

Newsom appealed his unsatisfactory performance appraisal and

_____

[2]These procurement audits are performed by the federal government to prevent fraud, waste, etc., by companies that contract with the federal government.

[3]The "pre-CPSRs" are performed, because failing a government CPSR apparently can result in a company's government contracts being suspended.

demotion pursuant to Textron's internal appeal process. The appeal was heard by a supervisor of the Senior Compliance Analyst position and another manager at Textron. In January of 1990 the Textron managers determined the demotion was proper and fair, and the managers refused to reinstate Newsom to the position of SCA.

On June 21, 1990, Newsom filed an age discrimination charge with the Equal Employment Opportunity Commission (EEOC) complaining of his demotion to Buyer II and other allegedly discriminatory actions on the part of Textron. In the charge, Newsom listed August 10, 1989, as the date on which the most recent discrimination against him had occurred. On September 14, 1990, Newsom amended his charge by inserting the word "continuing" after the August 10, 1989, date in order to signify that the discrimination against him was continuing. On July 18, 1991, the EEOC determined that Newsom's age discrimination claim was without merit. Thereafter, on August 9, 1991, Newsom filed the present action against Textron alleging, *inter alia*, that his demotion violated his rights under the ADEA .

Following Newsom's demotion and during the pendency of Newsom's age discrimination action, he continued his employment at Textron in the position of Buyer II. Two of Newsom's duties as a Buyer II were procuring materials and supplies from tool vendors through competitive price bidding and ensuring that Textron complied with the defense industry's initiatives regarding fraud, waste, and abuse in government contracts. In August of 1990, Newsom was evaluated by his supervisors as "meeting the standards" of the Buyer II position. In August of 1991, Newsom was again evaluated as "meeting the standards" required of a Buyer II.

In late 1991 and early 1992, Textron decided to open a competitive bidding process to select a company to provide all of Textron's cutting tools. During the

4

bidding process, Textron managers became aware that one company, Tool Group Network, had obtained $600,000 of Textron's business in a short period of time. Dick Kottler, Textron's Director of Materials, allegedly became concerned over Tool Group's rapid acquisition of Textron business, and he initiated an internal audit of Textron's contracts with Tool Group. Textron's legal department, which supervised the internal investigation, was required by the Anti-Kickback Enforcement Act of 1986, 41 U.S.C. §§ 55-58 (1986), to report the existence of the investigation to the federal government. [4] Subsequent to Textron's report, Newsom and other Textron employees were interviewed by agents of the federal government regarding Newsom's award of the Tool Group contracts.

During the course of the Textron investigation, an employee of Textron who was reviewing the Tool Group contracts discovered that a number of Textron contracts had been awarded to Tool Group without competition and at higher prices than previous tool contracts, and that some of the Tool Group contract documentation had apparently been altered. The Textron investigation also disclosed instances in which Tool Group had been underbid by a competitor, but Tool Group reduced its bid to slightly under that of a competitor, and was thereafter awarded the contract.

The Textron investigation showed that the two buyers who had been awarding the Tool Group contracts were Martha Martin and Newsom, and both buyers were questioned regarding the contract awards. Following the investigation, Textron allegedly believed that Newsom had been favoring Tool Group during the competitive bidding process, that Newsom had engaged in outside meetings with Tool Group during the bidding competition, and that

---

[4]The Anti-Kickback Enforcement Act of 1986 provides in pertinent part, " Whenever a prime contractor . . . has reasonable grounds to believe that a violation of section 53 of this title may have occurred, the prime contractor . . . shall promptly report the possible violation in writing." 42 U.S.C. § 57(c)(1)(A)(1986).

Newsom had awarded Tool Group some Textron contracts when Tool Group was not the lowest bidder on those contracts. Textron investigators also believed that Newsom had accepted outside entertainment from Tool Group and had entered into a long term contract with Tool Group without his supervisor's approval of the contract. Textron concluded that Newsom had engaged in improper and potentially illegal favoritism toward Tool Group Network, and Textron fired Newsom on March 27, 1992. Textron's stated reason for Newsom's discharge was that he "violated . . . company policies and fail[ed] to perform job duties."

Following his employment termination, Newsom amended the complaint in this case on July 21, 1992, alleging that his rights under the THRA were violated, because he was discharged in retaliation for filing his age discrimination suit against Textron in connection with his demotion. The amended complaint also alleges that Textron's actions in connection with Newsom's demotion and termination were slanderous and constituted outrageous conduct.[5]

A trial court should grant a motion for summary judgment only if the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03; *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Dunn v. Hackett*, 833 S.W.2d 78, 80 (Tenn. App. 1992). The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd*, 847 S.W.2d at 210. When a motion for summary judgment is made, the court must consider the motion in the same manner as a motion for directed verdict made at the

---

[5]In his complaint and amended complaint Newsom also asserted a THRA cause of action "concerning age discrimination in connection with a demotion, performance appraisal, appeal from that performance appraisal, and failure to consider him for open positions; . . .[ a] cause of action for breach of the implied covenant of good faith and fair dealing; and . . . [a] cause of action . . . for violation of Tenn. Code Ann. § 47-50-109." Newsom does not contest the rulings of the chancellor on these causes of action.

close of the plaintiff's proof; that is, "the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Id.* at 210-11. In *Byrd*, the Tennessee Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. [citations omitted]. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211. (emphasis in original).

The summary judgment process should only be used as a means of concluding a case when there are no genuine issues of material fact, and the case can be resolved on the legal issues alone. *Id.* at 210 (citing *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 33 (Tenn. 1988)). Summary judgment is not to be used as a substitute for a trial of genuine and material factual issues. *Byrd*, 847 S.W.2d at 210 (citing *Blocker v. Regional Medical Ctr.*, 722 S.W.2d 660, 660-61 (Tenn. 1987)). Where a genuine dispute exists as to any material fact or as to the conclusions to be drawn from those facts, a court must deny a motion for summary judgment. *Byrd*, 847 S.W.2d at 211 (citing *Dunn*, 833 S.W.2d at 80).

## I. ADEA Cause of Action

We will first address Newsom's claim that Textron violated the ADEA. 29 U.S.C. § 623(a)(1) provides in pertinent part:

> It shall be unlawful for an employer --(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . .

Newsom contends that Textron's actions surrounding his demotion on August 10, 1989, his performance review on August 30, 1989, and his

7

performance review appeal in January of 1990, all violated the ADEA. Newsom contends that Textron demoted him from SCA to Buyer II because of his age, and that Textron's stated reason for terminating his employment was merely pretextual.

Textron argues that Newsom is barred from asserting an ADEA claim because he did not file a charge with the EEOC within 300 days of the alleged discrimination as required by 29 U.S.C. § 626(d)(1985). 29 U.S.C. § 626(d) provides in pertinent part:

> No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed . . . within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

Textron asserts that Newsom was aware that he would be demoted from SCA to Buyer II on August 10, 1989, but he did not file a charge with the EEOC until 307 days later on June 21, 1990; therefore, his ADEA claims are time-barred.

Newsom, on the other hand, contends that his June 21, 1990 charge was timely filed since it was filed within 300 days of Textron's internal appeal ruling in January of 1990 and within 300 days of Newsom's employee evaluation on August 30, 1989. Newsom is apparently arguing that Textron "continuously" violated the ADEA when it did not reverse its demotion decision in the employee evaluation or through Textron's internal appeals procedure;[6] therefore, the 300 day time limit for filing the EEOC charge did not begin to run until one of those

---

[6]We say "apparently" because both Newsom's brief and his reply brief are utterly void of any argument or authority supporting Newsom's position that the charge was timely filed. In his reply brief, Newsom's counsel merely states, "Newsom's 1989 performance appraisal occurred on August 30, 1989, and the denial of his appeal therefrom in January, 1990, both actions within three hundred (300) days of his EEOC charge, as required by 29 U.S.C. § 626(d)." Appellant's reply brief at 3.

dates (both of which are within 300 days of the charge filing).[7]

We think plaintiff's ADEA claims are barred by section 626(d)'s time limitation for filing an EEOC charge, because Newsom did not file his charge within 300 days of the alleged discrimination. Newsom knew on August 10, 1989 that he would be demoted, but he did not file an EEOC charge until 307 days later on June 21, 1990. The timely filing of a charge of age discrimination is a condition precedent to maintaining an ADEA lawsuit. *Jackson v. Richards Medical Co.*, 961 F.2d 575, 578 (6th Cir. 1992). Although the 300 day limitation period is not jurisdictional in nature, and like a statute of limitations, may be tolled for equitable reasons, failure to file within the limitations period will bar an ADEA action unless some equitable ground exists for tolling the filing deadline. *Id.* The limitations period begins to run when the plaintiff's cause of action accrues.

In *Vaught v. R.R. Donnelly & Sons Co.*, 745 F.2d 407 (7th Cir. 1984), the Seventh Circuit Court of Appeals considered a question very similar to that presented by the case *sub judice.* In *Vaught*, the 59 year old plaintiff brought an ADEA age discrimination suit after he was demoted and replaced by a younger employee. In October of 1979 the plaintiff learned that he was being demoted from Department Manager to Communication Systems Analyst, and that he was being replaced by a younger employee who plaintiff believed to be outside the ADEA protected age category. The defendant company's stated reason for demoting plaintiff was that plaintiff's work performance in the position of Department Manager had been unsatisfactory. When the plaintiff learned of his demotion he met with one of the company's executives who told the plaintiff that he (the executive) would investigate the demotion. The plaintiff waited for

---

[7]Newsom does not specify on which of the two dates his cause of action accrued.

the executive to "get back to [him]" regarding the investigation, but the executive apparently never commenced any investigation into the demotion. *Id.* at 410. In December of 1980 the plaintiff learned that in addition to demoting him, the defendant company had also been removing a number of middle-level managers over the age of fifty. The plaintiff then filed an age discrimination charge with the EEOC on March 6, 1980, and an ADEA lawsuit in federal district court shortly thereafter.

The district court held that plaintiff's ADEA lawsuit was time-barred, because the plaintiff filed his EEOC charge more than 180 days[8] after the plaintiff knew or should have known facts that would support a discrimination charge. *Id.* at 410-11. The court held that plaintiff was aware of facts which would support a discrimination charge in October of 1979 and that the 180 day time limit began running at that time rather than December of 1980; therefore, the March 6, 1980, filing was untimely and plaintiff's ADEA suit was barred.

The Seventh Circuit affirmed, stating:

> The filing deadline with the EEOC is tolled until the time when facts that would support a charge of discrimination were apparent or should have been apparent to a person with a reasonably prudent regard for his rights . . . .' [*Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 931 (5th Cir. 1975)].

---

[8] The *Vaught* case was commenced in Indiana. The applicable time limit for filing EEOC charges in Indiana and other states which are not "deferral states" is 180 days rather than 300 days. 29 U.S.C. § 626(d)(1). A deferral state is one in which the state has enacted its own laws prohibiting age discrimination in employment and has authorized a state agency to seek relief for the claimant. "The purpose of the longer [300 day] limitation period is to give deferral states time to act upon the ADEA complaint, in accordance with Congress's intent that "informal methods of conciliation, conference, and persuasion" be used to eliminate the discriminatory practice before an action is initiated in the courts." *Jackson v. Richards Medical Co.*, 961 F.2d 575, 578 (6th Cir. 1992)(quoting 29 U.S.C. § 626(b)(1985)). Tennessee is a deferral state. T.C.A. § 4-2-101 (1991)("It is the purpose and intent of the general assembly by [the enactment of the Tennessee Human Rights Act] to [p]rovide for execution within Tennessee of the policies embodied in the . . . Age Discrimination in Employment Act of 1967, as amended . . . .").

* * *

> In October 1979, Vaught knew more than enough
> facts to establish a prima facie case: he knew that he
> was fifty nine years old; he knew that he had always
> received very good job performance evaluations and,
> so far as he knew, he had no reason to suspect that his
> job was in danger; he knew that he was demoted;
> and he knew that he was being replaced by a man
> he believed to be twenty years his junior.
>
> It is apparent that in October 1979 Vaught knew
> facts that would support a discrimination charge . . .
> yet he failed to go to the EEOC.

*Id.* at 410-11. The court further held,

> Vaught's use of an informal grievance procedure, by
> itself, does not stop the statute of limitations from
> running. "[T]he pendency of a grievance or some
> other method of collateral review of an employment
> decision, does not toll the running of the limitations
> period." *Delaware State College v. Ricks*, 449 U.S. 250,
> 261, 101 S.Ct. 498, 505, 66 L.Ed.2d 431 (1980)(citing *Int'l
> Union of Electrical Radio and Machine Workers v.
> Robbins & Myers, Inc.*, 429 U.S. 229, 97 S.Ct. 441, 50
> L.Ed.2d 427 (1976)).

*Id.* at 412.

Applying *Vaught* to the case *sub judice*, we conclude that Newsom knew

or should have known sufficient facts on August 10, 1989, to file a charge of

discrimination with the EEOC. On August 10, 1989, Newsom knew that he was

within the protected age category, that he had received favorable evaluations

as a Senior Compliance Analyst in 1988, and that he was being demoted. The

record is unclear as to exactly when Newsom knew that he was being replaced

as SCA by Sherry Ritchie, however, Newsom has offered no evidence that he

could not have discovered, by the exercise of reasonable diligence, that he

was being replaced by Sherry Ritchie when he received notice of his demotion.[9]

_____

[9]Appellants have neither asserted nor offered any evidence that Newsom
inquired as to who would replace him, or that Textron answered such an inquiry
with false or misleading information, or otherwise attempted to conceal the
identity of Newsom's successor. Thus, with respect to the issue of when Newsom
had or should have had knowledge of the identity of his successor, there is no

11

Therefore, his claim accrued on August 10, 1989.

This conclusion finds support in the decisions of federal courts. In *Allen v. Diebold, Inc.*, 807 F. Supp. 1308 (N.D. Ohio 1992), the plaintiffs were informed on October 2, 1989, that their jobs would be terminated. In November of 1990, the plaintiffs learned that the defendant company had hired younger individuals to replace them. The plaintiff's argued, *inter alia*, that their EEOC charges were timely filed because they were filed within 300 days of the time that plaintiff's learned that they were being replaced by younger employees. The court rejected the plaintiffs' argument that the 300 day period should have been equitably tolled until plaintiffs suspicions of age discrimination were confirmed when they learned that they were being replaced by younger employees. The court held that the 300 day limitation period began to run when the employees received notice of their termination. The court stated:

> Plaintiffs have offered no facts, apart from the remoteness of the Southern facilities, to explain why they did not earlier discover the defendant's employment practices at some earlier time. This court is inclined to believe that such facts should be forthcoming in order to satisfy the due diligence requirement of equitable tolling. *See Wall v. National Broadcasting Co., Inc.*, 768 F.Supp. 470, 476 (S.D.N.Y. 1991)(summary judgment appropriate when plaintiff has "failed to set forth evidence demonstrating that he could not have discovered the alleged discriminatory act at an earlier date in the exercise of reasonable diligence.")

*Allen*, 807 F. Supp. at 1317. The court further stated:

> Moreover, there is authority, albeit not-controlling, for the proposition that the ADEA filing limit may not be tolled until the plaintiff discovered the hiring of a younger replacement when the employer had not used the timing delay in hiring a replacement as a means to delay plaintiff's filing. *English v. Pabst*

---

evidence of any action on the part of employer Textron that would justify equitable estoppel. See *Allen v. Diebold, Inc.*, 807 F. Supp. 1308 (N.D. Ohio 1992)(discussing the difference between equitable tolling and equitable estoppel).

*Brewing Co.*, 828 F.2d 1047, 1050-51 (4th Cir. 1987) cert. denied, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988).

Id. at 1317-18.

Newsom has failed to set forth any evidence showing that he could not have discovered on August 10, 1989, that he was being replaced by Sherry Ritchie. It is necessary to place a burden of reasonable inquiry/diligence upon Newsom to prevent him (and other ADEA plaintiffs) from "sitting on his (their) rights." Were we to hold otherwise, the limitations period for filing an ADEA charge of age discrimination would never commence until a plaintiff fortuitously learned of the identity of his/her successor. In addition, the limitations period could be easily circumvented by a plaintiff conveniently asserting that he/she never had knowledge of the identity of his/her successor until a date within 300 days preceding the charge filing. Thus, we conclude that on August 10, 1989, Newsom knew or should have known sufficient facts to file a charge of discrimination with the EEOC; therefore, any cause of action which Newsom had against Textron accrued on that date.

The appellants contend that Newsom's EEOC charge was timely, because it was filed within 300 days of his employment evaluation on August 30, 1989, and Textron's denial of his evaluation/demotion appeal in January of 1990. We must reject this contention, because as previously stated, if Newsom had a cause of action at all against Textron, such cause of action accrued on August 10, 1989. Textron's actions in demoting Newsom, evaluating him pursuant to its policy of annual employee evaluation, and denying Newsom's internal appeal, were not separate or continuing acts of discrimination. Rather, Textron's employment evaluation and denial of Newsom's appeal merely affirmed Textron's decision to demote Newsom. In his demotion/evaluation appeal, Newsom was contesting Textron's demotion and essentially asking Textron to reinstate him. This

13

being the case, Textron's "failure to reinstate or rehire does not . . . constitute an actionable new act of discrimination or continuing discrimination so as to allow the limitations period to begin at the time the . . . employee requests reinstatement." *Redd v. Fisher*, 814 F. Supp. 547, 550 (W.D.Tex. 1992) *aff'd* 35 F.3rd. 61 (1st Cir. 1994).[10] Therefore, we conclude that Newsom's June 21, 1990, EEOC filing was untimely, and, therefore, his ADEA claims in this case are barred.[11]

## II. THRA Cause of Action

In addition to asserting an ADEA claim, Newsom alleges that his discharge on March 27, 1992, was in retaliation for his filing an EEOC age discrimination charge and age discrimination lawsuit against Textron. Newsom argues that Textron discharged him because he took these actions and that such discharge violated T.C.A. § 4-21-301(1)(1991), which provides:

> Discriminatory Practices.--It is a discriminatory practice for a person or for two (2) or more persons to:
> (1) Retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter . . . .

In order to establish a *prima facie* case of retaliatory discharge under the THRA a plaintiff must prove the following: (1) the plaintiff engaged in a protected activity; (2) the exercise of the plaintiff's protected civil rights was

---

[10]For other authority supporting this conclusion see *Delaware State College v. Ricks*, 449 U.S. 250, 261, 101 S.Ct. 498, 506 n. 15, 66 L.Ed.2d 431 (1980)("Mere requests to reconsider . . . cannot extend the limitations periods applicable to the civil rights laws."); *Collins v. United Airlines, Inc.*, 514 F.2d 594, 596 (9th Cir. 1975) (A denial of a request for reinstatement does not constitute a continuing violation or a new and separate discriminatory act, because "[a] discharged employee who seeks to be reinstated is really litigating the unfairness of his original discharge . . . .")(quoting *NLRB v. Textile Mach. Works*, 214 F.2d 929, 932 (3rd Cir. 1954)).

[11]In light of this holding, we do not consider Newsom's other ADEA arguments.

known to the defendant; (3) the defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Haynes v. Knoxville Utilities Bd.*, C/A No. 03A01-9209-CH-362, 1993 Tenn. App. Lexis 260, at *2 (Tenn. App. April 8, 1993); *see also Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990), cert denied 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990)(holding that a plaintiff must prove these same four elements to establish a retaliatory discharge in violation of Title VII).[12] Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to "articulate some legitimate, non discriminatory reason . . ." for discharging the plaintiff. *Canitia*, 903 F.2d at 1066 (quoting *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 668 (1973)). The burden then shifts back to the plaintiff employee to demonstrate that the employer's proffered reason for termination was merely pretextual and that the adverse employment decision was motivated by a desire to retaliate against the employee. *Canitia*, 903 F.2d at 1066.

Textron apparently concedes that the first three elements of establishing a THRA retaliatory discharge claim are satisfied, thus the only element in dispute is whether a causal connection exists between Newsom's discharge in March of 1992 and his filing of the age discrimination suit in August of 1991 and/or his filing of the EEOC charge in June of 1990. Newsom asserts that a causal connection exists between the two events, because only seven months transpired between Newsom's filing of the suit and his discharge, and that Textron's proffered reason for his discharge was a pretext. Newsom also argues that a causal connection exists, because Textron based Newsom's discharge on

---

[12]The purpose of the THRA is essentially identical to the ADEA; therefore, federal authority interpreting the ADEA is often utilized by courts of this state in applying the THRA. *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95 (Tenn. App. 1984).

his receipt of meals from vendors during the competitive bidding process. Newsom asserts that this reason is obviously a pretext, because other "similarly situated" Textron employees received meals but were not disciplined in any way.             Newsom asserts that Textron's stated reason for his termination (that he "violated . . . company policies and fail[ed] to perform job duties") is only a pretext, because the official company guidelines which he was alleged to have violated (those forbidding receipt of gratuities and kickbacks during a competitive bidding process) were not enforced against other employees of Textron who also violated the guidelines. Newsom argues that Textron's stated reason for discharging him was because he accepted certain meals from Tool Group Network during the bidding process, and that Textron's stated reason is obviously a pretext since other employees received meals during the bidding process, yet they were not disciplined/discharged for the receipt of such meals. Our review of the record reveals that Textron's stated reason for discharging Newsom was not because he accepted meals, but rather because Newsom was favoring Tool Group during the bidding process.

Textron's proof establishes that the reason Newsom was fired was because he awarded contracts to Tool Group when Tool Group was not the lowest bidder, he awarded long-term contracts to Tool Group without the required concurrence from his supervisor, and he had outside meetings with Tool Group officials during the competitive bidding process.  Newsom has not offered sufficient evidence which would show that Textron's above stated reasons for his dismissal were merely pretextual.  As proof that the reason stated by Textron for his dismissal was a pretext, Newsom offers his own affidavit and evidence that various Textron officials received meals from tool vendors during the bidding process but were not disciplined for the receipt of such meals.  Newsom also offers "Textron Business Conduct Guidelines" which state,

16

> Reasonable and customary business entertainment is acceptable. Meals or entertainment, whether paid for by Textron employees or another party, should be in conjunction with business activity. The expense involved, the identity of the participants and the duration and extent of the entertainment should be reasonable in relation to the business conduct and the business purpose.

Newsom argues that this guideline establishes that it was acceptable for him to receive business meals during the bidding process, and that even if the receipt of such meals was not acceptable, he was the only employee disciplined/terminated for violating the guideline. Therefore, Textron's termination of Newsom for receiving business meals was merely a subterfuge to terminate him for filing the discrimination suit.

This argument fails, because as stated above, Newsom has failed to produce any evidence that he was in fact terminated for receiving business meals. The only evidence that Newsom has offered that Textron discharged him for receiving business meals (rather than for favoring Tool Group in the bidding process) is paragraph 19 of his affidavit in which he states,

> I was terminated from the position of Buyer II on March 27, 1992. Textron states that I was terminated for "violation of company policies and failure to perform job duties." I believe the real reason was my filing of a [sic] age discrimination lawsuit against Textron in August, 1991. The specific policy which I was accused of violating is contained in Textron's Business Conduct Guidelines and concerned the receipt of gratuities and kickbacks. . . . Specifically, it was my understanding that various business meals involving myself, other Textron employees and a vendor which were paid for by the vendor formed the basis of Textron's conclusion that I was accepting gratuities and/or kickbacks and being improperly influenced by the vendor. I never received gratuities or kickbacks and was never improperly influenced by a vendor. Further, I did not violate Textron's procurement regulations in selecting vendors to provide Textron with materials, supplies or tools. At all times I complied with Textron's requirements and my supervisor's instructions.

Newsom's mere "belie[f]" or "understanding" that he was discharged for

17

receiving business meals is insufficient to create a genuine issue of material fact. The record provides no evidence that creates a factual dispute as to whether Textron's stated discharge grounds were merely a pretext for terminating Newsom because he filed an age discrimination suit against Textron. Therefore, the trial court's grant of summary judgment to Textron on Newsom's THRA cause of action was proper.

### III Outrageous Conduct Cause of Action

In Count VI of his amended complaint, Newsom contends that Textron's actions surrounding his termination were outrageous and caused him extreme humiliation and embarrassment. Newsom avers that Textron reported his actions in the competitive bidding process to the federal government without probable cause and before a thorough investigation of the facts on which the report was based. In addition, Newsom states:

> After terminating him, Textron provided him with a large brown plastic garbage bag into which he was required to place his personal possessions, which had been accumulated during just under thirty-five years of employment with Textron. He was then ushered to the exit through a common area at Textron where he was required to walk in front of his work peers and associates who he had known for many years.

Newsom contends that these actions are "beyond the pale of decency" and constitute outrageous conduct.

The tort of outrageous conduct "exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury." *Bringle v. Methodist Hosp.*, 701 S.W.2d 622, 625 (Tenn. App. 1985); *Swallows v Western Elec. Co.*, 543 S.W.2d 581, 582 (Tenn. 1976). Furthermore, this Court, commenting on the tort of outrageous conduct, has stated:

> It has not been enough that the defendant has acted

18

with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized community. Generally, the case is one which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Blair v. Allied Maintenance Corp.*, 756 S.W.2d 267, 273 (Tenn. App. 1988) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The record in this case does not reveal conduct that would support a charge of outrageous conduct, because the actions complained of do not rise to the level of outrageous, beyond the pale of decency, and atrocious and utterly intolerable in a civilized society.

## IV. Defamation Cause of Action

Finally, in Count VII of his amended complaint, Newsom asserts that Textron defamed him when it reported him to the federal government because of his actions in connection with Tool Group during the competitive bidding process. Newsom asserts that Textron's report of his actions to the Department of Defense pursuant to the Anti-Kickback Act, 41 U.S.C. §§ 51, *et. seq.* was "without factual support" and caused Newsom serious emotional distress. We need not reach the merits of Newsom's argument, because Newsom has failed to provide any evidence identifying the nature of the allegedly defamatory statements or that any defamatory statements were in fact made in connection with the report. Since Newsom apparently does not even know what statements were made to the government in connection with the report, he certainly cannot prove that the statements were false or caused him actual damages. *See Sullivan v. Young*, 678 S.W.2d 906, 910 (Tenn. App. 1984) ("The plaintiff must not only prove

19

publication of a false statement to a third person, but he must also prove actual damages.").

Accordingly, the order of the trial court granting summary judgment to defendant Textron is affirmed. Costs of this appeal are assessed against the appellant.

                _____
                W. FRANK CRAWFORD, PRESIDING
                JUDGE, W.S.

CONCUR:


_____
DAVID R. FARMER, JUDGE


_____
WILLIAM C. KOCH, JR., JUDGE