FILED

12/03/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2018 Session

**STATE OF TENNESSEE v. JOHN MATTHEW CABE**

**Appeal from the Circuit Court for Marshall County**
**No. 2017-CR-19    Forest A. Durard, Jr., Judge**

_____

**No. M2017-02340-CCA-R3-CD**

_____

Defendant, John Matthew Cabe, was indicted for tampering with evidence after selling an item, which was the subject of a theft investigation, from his pawnshop. After a jury trial, Defendant was convicted of attempted tampering with evidence. On appeal, Defendant contends that he was improperly charged with tampering with evidence because the Pawnbrokers Act of 1988 is a specific statute which governs his conduct as a pawnbroker, and he argues that the evidence was insufficient to support his conviction for attempted tampering with evidence. After a thorough review of the record and the applicable statutes, we conclude that the Pawnbrokers Act of 1988 specifically governs the actions of a pawnbroker in his or her official capacity, thereby precluding prosecution for tampering with evidence. Accordingly, the judgment of the trial court is reversed and vacated.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Vacated**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Brandon E. White (on appeal) and Lee Brooks (at trial), Columbia, Tennessee, for the appellant, John Matthew Cabe.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms and Drew Wright, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Brittany Pullin took some items from Michael Jones during a tumultuous time in their relationship. Among the items taken was a gold chain necklace. According to Mr. Jones, Ms. Pullin needed some money to keep from going to jail. One day, Ms. Pullin called Mr. Jones and told him that she was leaving. When Mr. Jones arrived at home, he noticed some of his personal belongings were missing. However, it took some time before he realized that his gold chain necklace was missing. Later, Mr. Jones became aware that Ms. Pullin had received money for his necklace when Ms. Pullin took Mr. Jones out to eat, and Ms. Pullin paid with the money. Mr. Jones also knew that Ms. Pullin had paid some fines with the money.

Suspecting that Ms. Pullin may have pawned the items, Mr. Jones called Cabe's Gun and Pawn to inquire. Defendant, the owner of Cabe's Gun and Pawn, spoke with Mr. Jones and informed him that on March 29, 2016, Michelle Edwards, Ms. Pullin's mother, had in fact sold a gold chain necklace to him. Mr. Jones informed Defendant that the necklace had been stolen and that he would be filing charges against Ms. Pullin. Mr. Jones told Defendant not to get rid of the necklace, and Defendant responded, "Don't tell me how to run my business." At some point after the phone call, Mr. Jones went to Cabe's Gun and Pawn to talk to Defendant about the necklace. According to Mr. Jones, he walked in and Defendant said, "I ain't got nothing to say." Defendant told Mr. Jones to either get Defendant's money back or to file the charges. Mr. Jones responded, "I'm going to file charges." However, Mr. Jones never provided written notice to the Defendant stating that he believed Defendant possessed property stolen from Mr. Jones.

The day after Mr. Jones went to Defendant's pawn shop, Michelle Edwards and Ms. Pullin came back into the pawn shop. While they were there, Mr. Jones called. In the midst of a three-way conversation about the necklace, Defendant told them that they all needed to go file charges because he was not the judge. At some point, Mr. Jones filed a report with the Marshall County Sheriff's Department.

On April 7, 2016, Detective Drew Binkley's office received a report of the theft of a gold necklace and a watch. The report noted that the necklace had been pawned at Cabe's Gun and Pawn. That same day, Detective Binkley went to the pawnshop and spoke with Valeria McCarty, an employee of Cabe's Gun and Pawn. Detective Binkley advised Ms. McCarty that he was there regarding a necklace that had been taken in by the pawnshop. Detective Binkley had the pawn ticket for the necklace, which was sent to the Sheriff's office by Gabe's Gun and Pawn as part of regular pawn procedure. The pawn ticket indicated that on March 28, 2016, the pawn shop purchased the necklace from Vonda Michelle Edwards, Ms. Pullin's mother, for the price of $250. Detective Binkley stated that he wanted to look at the necklace and inquired as to how it was obtained by the business. Ms. McCarty did not know how it was obtained and stated that Defendant must have taken it in. Ms. McCarty allowed Detective Binkley to view the necklace and called Defendant. While viewing the necklace, Detective Binkley took photographs of it.

At this point, Detective Binkley believed he had found what had been taken from Mr. Jones, but he did not take the necklace with him. According to Detective Binkley, he did not take it because it was an open investigation, and no determination had been made that it was the subject of a theft.

Detective Binkley spoke with Defendant on Ms. McCarty's cell phone. According to Defendant, the tone of the conversation was light, and Detective Binkley was unsure who was telling the truth about the necklace, Mr. Jones or Ms. Pullin. During that conversation, Detective Binkley told Defendant that the necklace had been reported stolen, that it was the subject of an open investigation, and that Detective Binkley would be leaving the necklace at the pawn shop. Detective Binkley advised Defendant not to get rid of the necklace because it had been stolen, and Defendant agreed that he would not. According to Defendant, he added that he would like Detective Binkley to get back with him in the next few days because if nothing was going to be pursued, then Defendant needed to sell the necklace. Detective Binkley agreed that he would get back with Defendant.

At a later date, Detective Tony Nichols spoke with Defendant about the necklace and told him that the case might be a civil issue and if it were, Defendant might be able to keep the necklace. Detective Nichols also told him to hold onto the necklace and not to get rid of it until he heard from Detective Binkley. Defendant remembered his conversation with Detective Nichols conversation differently. According to Defendant, Detective Nichols told him that no charges had been filed regarding the necklace. Other than his conversation with Detective Nichols, Defendant had heard nothing regarding the necklace between the day that Detective Binkley told him to hold onto the necklace and the day that Defendant was arrested. Ms. McCarty recalled Defendant saying that "when the time was up on the necklace, he could sell it if he wanted to because it was his property then."

Sometime between March 28th and May 5th, Defendant sold the necklace to his "gold man" (Charles Rogers) because law enforcement "never . . . pick[ed] it up." In the eight years that Defendant had been a pawnbroker, anytime that he has had an item that was subject to an investigation it was picked up by law enforcement within two days to a week at most. Defendant believed that he could sell the necklace because he never received a written hold order, which Defendant understood to be required by law. Additionally, he held the necklace for longer than required on a purchased item, and he believed no charges had been filed. According to Ms. McCarty, Defendant's stated reason for selling the necklace was because the "21 days were up." At a separate encounter with Defendant, Detective Nichols recalled Defendant stating that he sold the necklace because he needed the money.

During his investigation, Detective Binkley spoke with Ms. Pullin and Ms. Edwards about the transaction involving the necklace. Subsequently, Detective Binkley developed a theory that led to a criminal prosecution of Ms. Pullin for theft. Eventually, Ms. Pullin pled guilty to the theft charge.

On May 5, 2016, Detective Binkley went to Cabe's Gun and Pawn to retrieve the necklace. However, Detective Binkley was unable to retrieve the necklace after speaking with Ms. McCarty. Defendant was also present at the pawn shop and spoke with Detective Binkley. Defendant told Detective Binkley that the necklace had been sold to his "gold man" for scrap and could not be retrieved. Defendant also said that he had been given permission to sell the necklace from another detective. Detective Binkley called the other detective in the presence of Defendant, and the other detective denied ever giving Defendant permission to sell the necklace. Detective Binkley expected to be able to retrieve the necklace on May 5th because he had informed Defendant that the necklace was subject to an ongoing investigation and Defendant had given his word that he would hold on to the property. Detective Binkley admitted that he did not provide Defendant with a written document requesting that the necklace be held, nor did he provide Defendant with a period of time for which Defendant should hold the necklace. Detective Binkley's understanding of the law was that any item bought by a pawn shop had to be held for thirty days. Ultimately, Detective Binkley believed Defendant should have held the necklace indefinitely or until Detective Binkley retrieved it from him.

Defendant was arrested for tampering with evidence and posted bond. Once out of jail, Defendant called Chester Rogers to see if the necklace could be retrieved. Mr. Rogers still had the necklace in his possession. Defendant traded two guns to Mr. Rogers for the necklace. Defendant stated that he did not mean to interfere with the investigation. He explained that he retrieved the necklace because law enforcement wanted the necklace back. When Detective Binkley learned that Mr. Rogers was the person to whom Defendant sold the necklace, Detective Binkley contacted Mr. Rogers and was informed that the necklace had been returned. On May 6th, the necklace was dropped off at Detective Binkley's office by Rob Dalton.

On April 26, 2016, a Marshall County grand jury indicted Defendant for tampering with evidence. After hearing the evidence at trial, the jury found Defendant guilty of attempted tampering with evidence as a lesser-included offense, a class D felony offense. The trial court imposed a suspended sentence of two years and six months and placed Defendant on probation. Defendant's motion for new trial was denied, and this timely appeal soon followed.

*Analysis*

- 4 -

Defendant argues that the specific provisions of the Tennessee Pawnbrokers Act of 1988, Tennessee Code Annotated sections 45-6-201 to -224 ("the Pawnbrokers Act"), govern the actions of a pawnbroker in his or her official capacity and, thus, preclude prosecution of a pawnbroker acting in his or her official capacity for tampering with evidence under the general statutory provisions in Tennessee Code Annotated section 39-16-501(a)(1). The State contends that the Pawnbrokers Act is not the exclusive means of prosecuting a pawnbroker because it merely sets forth the regulatory regime governing pawnbrokers. Because of the Pawnbrokers Act's stated purpose, specific provisions, and enumerated criminal punishments, we agree with the Defendant that the Pawnbrokers Act precludes prosecution of a pawnbroker acting within his or her official capacity for tampering with evidence.

Statutory construction is a question of law that we review de novo. *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017). Our goal is to give full effect to the legislature's purpose, without exceeding its intended scope. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010). "'In ascertaining the intent of the legislature, this Court may look to the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment.'" *State v. Edmonson*, 231 S.W.3d 925, 927 (Tenn. 2007) (quoting *State v. Collins*, 166 S.W.3d 721, 726 (Tenn. 2005)). We begin with the statute's language and give the legislature's chosen words their natural and ordinary meaning. *Id.* In so doing, we construe the words of the statute "in the context in which they appear in the statute and in light of the statute's general purpose." *Id.*

"When a statute's text is clear and unambiguous, the courts need not look beyond the statute itself to ascertain its meaning." *Lee Med., Inc.*, 312 S.W.3d at 527. However, conflicting statutes may create an ambiguity. *See id.* Statutes that relate to the same subject or have a common purpose are construed "in pari materia." *Edmonson*, 231 S.W.3d at 927. Those statutes must be construed harmoniously, so that they do not conflict. *State v. Turner*, 193 S.W.3d 522, 526 (Tenn. 2006). Additionally, specific statutory language controls over a conflicting general statutory provision. *Turner*, 193 S.W.3d at 526. "[W]here the mind of the legislature has been turned to the details of a subject and they have acted upon it, a statute treating the subject in a general manner should not be considered as intended to affect the more particular provision." *Arnwine v. Union County Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn. 2003) (quoting *Woodroof v. City of Nashville*, 192 S.W.2d 1013, 1015 (Tenn. 1946)).

"The rules of statutory construction permit the courts to employ a number of presumptions with regard to the legislative process." *Lee Med., Inc.*, 312 S.W.3d at 527. This Court may presume that the legislature "used every word deliberately and that each word has a specific meaning and purpose," "did not intend to enact a useless statute," and "did not intend an absurdity." *Id.* Additionally, we presume that the legislature is

knowledgeable about its prior enactments and knows the state of the law at the time it passes legislation. *Edmonson*, 231 S.W.3d at 927. "[W]here the legislature includes particular language in one section of the statute but omits it in another section of the same act, it is presumed that the legislature acted purposefully in including or excluding that particular subject." *Id.* (quoting *State v. Hawk*, 170 S.W.3d 547, 551 (Tenn. 2005)).

When attempting to resolve a statutory ambiguity, the rules of statutory construction permit us to consider, "among other things, public policy, historical facts preceding or contemporaneous with the enactment of the statute being construed, and the background and purpose of the statute." *Lee Med., Inc.*, 312 S.W.3d at 527 (internal citations omitted). Additionally, we may consider "[an] earlier version of the statute, the caption of the act, the legislative history of the statute, and the entire statutory scheme in which the statute appears." *Id.* The Legislature holds the power to define criminal offenses and assess punishments for crimes. *Gentry*, 538 S.W.3d at 42 (citing *State v. Burdin*, 924 S.W.2d 92, 87 (Tenn. 1996)). It is not this Court's role to substitute our policy judgments for those of the legislature. *Id.* (citing *Frazier v. State*, 495 S.W.3d 246, 249 (Tenn. 2016)).

First, we review the provisions within the Pawnbrokers Act at issue in this case and the tampering with evidence statute, as they were in April of 2016. To assist local governments in the exercise of their police power, the Pawnbroker's Act provides a mechanism by which a law enforcement official may require a pawnbroker to hold an item that was determined to be stolen after its purchase. The prerequisites for a law enforcement official to issue a hold order are set out as follows:

> When an appropriate law enforcement official has probable cause to believe that property in the possession of a pawnbroker is misappropriated or stolen, the official may place a *written* hold order on the property. The written hold order shall impose a holding period not to exceed ninety (90) days unless extended by court order. The appropriate law enforcement official may rescind, in writing, any hold order. An appropriate law enforcement official may place only one (1) hold order on the property.

T.C.A. § 45-6-213(f) (2012) (emphasis added).[1] In addition to providing the prerequisites for the issuance of a hold order, the Pawnbrokers Act details the contents of the hold order by stating:

A hold order must specify:

---

[1] On July 1, 2016, Tennessee Code Annotated section 45-6-213(f) was amended to replace "may place a written hold order on the property" with "shall, upon expiration of the ten day period required by subdivision (b)(2) place a written hold order on the property."

- 6 -

(1) The name and address of the pawnbroker;

(2) The name, title and identification number of the representative of the appropriate law enforcement official or the court placing the hold order;

(3) If applicable, the name and address of the appropriate law enforcement official or court to which such representative is attached and the number, if any, assigned to the claim regarding the property;

(4) A complete description of the property to be held, including model number and serial number if applicable;

(5) The name of the person reporting the property to be misappropriated or stolen unless otherwise prohibited by law;

(6) The mailing address of the pawnbroker where the property is held;

(7) The expiration date of the holding period.

T.C.A. § 45-6-213(h) (2012). While a hold order is in effect, the pawn broker must release the item subject to the hold order, upon request, to the custody of a law enforcement official for use in a criminal investigation. T.C.A. § 45-6-213(j)(20) (2012). Once a hold order has expired, a pawnbroker must notify the law enforcement agency of its expiration and hold the item for an additional ten days after the law enforcement agency has received the notice. T.C.A. § 45-6-213(g) (2012). Failure to hold the item for the duration of the hold order is a Class A misdemeanor. T.C.A. § 45-6-218(a) (2007).

On the other hand, the tampering with evidence statute, as charged in this case, states:

(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress to:

(1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; . . . .

(b) A violation of this section is a Class C felony.

T.C.A. § 39-16-503.

The factual situation illustrated by this case presents a conundrum for pawnbrokers. What is a pawnbroker to do with an item when a law enforcement official has not provided the pawnbroker with a written hold order for the item? Should the pawnbroker carry on with his business and sell the item to make a profit, or should he hold the item at the risk of suffering a loss? On the other hand, if a pawnbroker were to sell the item, would he, or should he, be subject to a felony criminal prosecution? These are the very questions that a pawnbroker, such as Defendant, faces when a law enforcement official does not issue a hold order pursuant to the Pawnbrokers Act. In that scenario, the law appears ambiguous as to what, if any, criminal liability a pawnbroker may suffer. The rule of lenity is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited." *Dunn v. United States*, 442 U.S. 100, 112 (1979). Here, at the intersection of the Pawnbroker's Act and the tampering with evidence statute, a pawnbroker is forced to speculate about the legality of his conduct. No citizen, pawnbroker or otherwise, should be placed in such peril.

The Pawnbrokers Act specifically provides the means by which a claimant and a law enforcement official can retrieve an item from the pawnshop, and it provides protection for the pawnbroker that allows him to freely conduct business. It appears clear from the detailed instructions in the statute that the legislature contemplated a scenario where a law enforcement official would need to investigate a case of a stolen item possessed by a pawnshop. In such a scenario, the legislature prescribed that a law enforcement official "may" place a "written" hold order on the property and that the pawnbroker "shall" provide the property to law enforcement upon request. While the version of the Pawnbrokers Act in effect during April of 2016 did not require or place a duty on a law enforcement official to issue a hold order upon a finding of probable cause that the pawnbroker possessed a stolen item, that version of Pawnbrokers Act did require a written hold order before a pawnbroker was required to hold an item for a law enforcement official. The *specificity* of the Pawnbrokers Act is distinguished from the *general* nature of the tampering with evidence statute, which requires no specific action by a law enforcement official before a defendant can be prosecuted. Detective Binkley was either unaware of the procedures set forth in the Pawnbrokers Act, or he chose not to follow them. This oversight by Detective Binkley would have prevented prosecution of Defendant for a violation of the Pawnbrokers Act. Compliance with the act may have rendered a different result from this Court.

Regardless, Defendant was prosecuted for tampering with evidence. If a law enforcement official can ignore the procedures contained in the Pawnbrokers Act and charge a pawnbroker with tampering with evidence, a felony, instead of a violation of the Pawnbrokers Act, a misdemeanor, then the provisions of the Pawnbrokers Act that require a law enforcement official to issue a written hold order before a pawnbroker may be required to hold an item are useless for all practical purposes.

Now, we turn to the stated purpose of the statute at hand. The Pawnbroker's Act sets forth its purpose as follows:

> The making of pawn loans and the acquisitions and disposition of tangible personal property by and through pawnshops vitally affects the general economy of this state and the public interest and welfare of its citizens. It is the policy of this state and the purpose of this part to:
>
> (1) Ensure a sound system of making loans and acquiring and disposing of tangible personal property by and through pawnshops and to prevent unlawful property transactions, particularly in stolen property, through licensing and regulating pawnbrokers and certain persons employed by or in pawnshops;
>
> (2) Provide for licensing fees, investigation fees, and minimum capital requirements of licensees;
>
> (3) Ensure financial responsibility to the state and the public;
>
> (4) Ensure compliance with federal and state laws; and
>
> (5) Assist local governments in the exercise of their police power.

T.C.A. § 45-6-202. The stated purpose of the Pawnbroker's Act reveals that the legislature contemplated the potential acquisition and disposal of stolen property when devising a sound system of regulation for the vital economic activity that occurs at pawnshops. Additionally, the legislature was mindful of federal and state laws, like the tampering with evidence statute, and the need for local governments to exercise their police powers during the formation of the Pawnbroker's Act. All of this points to the legislature turning its mind to the specific inner-workings of a pawnshop, which would include a scenario such as the one faced by Defendant, and making laws to govern pawnbrokers *while acting in their official capacity*. Prosecuting a pawnbroker, acting in his or her official capacity, in the manner Defendant was forced to defend, has a chilling effect on the legislature's stated view that the pawn industry is vital to the general economy.

The Pawnbrokers Act also provides specific criminal punishments for violations. In addition to suffering a suspension or revocation of their pawn license, the Pawnbrokers Act provides that "[e]very person, firm or corporation, or agents or employees thereof, who knowingly violates any provision of this part, on conviction, commits a Class A misdemeanor." T.C.A. § 45-6-218(a) (2007). We find it noteworthy that the legislature

- 9 -

provided specifically for prosecution under the theft statute, T.C.A. § 39-14-103, for the knowing receipt of stolen property by a pawnbroker. T.C.A. § 45-6-218(b) (2007). If there was any evidence in the record that Defendant was implicated in a theft, even acting in his official capacity as a pawnbroker, our result would almost certainly be different. However, the legislature made no such provision for prosecution under the tampering with evidence statute for the sale of an item known to be part of a criminal investigation. "When the statutory language is silent as to the issue at hand, the 'objective and spirit behind the legislation' may be determinative." *State v. McNack*, 356 S.W.3d 906, 909 (Tenn. 2011) (quoting *Lipscomb v. Doe*, 32 S.W.3d 840, 845 (Tenn. 2000)). Given the purpose of the Pawnbrokers Act and the obvious fact that the legislature contemplated the Pawnbrokers Act interacting or overlapping with criminal statutes, we find the lack of a provision providing for prosecution under the tampering with evidence statute to indicate that the legislature intended the Pawnbrokers Act to govern a scenario such as Defendant's.

It is the criminal punishment provisions of the Pawnbrokers Act which distinguish this case from *State v. Gentry*, 538 S.W.3d 413 (Tenn. 2017), which the State argues is directly applicable. In *Gentry*, the defendant argued that her squatter's rights under the Uniform Residential Landlord Tenant Act ("URLTA") precluded her from criminal prosecution for theft of real property and that the matter was a civil issue between the bank that owned the home and the defendant. *Id.* at 426. Our Supreme Court held that even though the bank could have sought civil remedies to evict the defendant, the statute did not preclude prosecution of the defendant for theft of real property. *Id.* Our review of URLTA revealed neither contemplation by the legislature that URLTA would interact or overlap with other criminal statutes nor a provision in URLTA providing criminal punishments for violations. *See* T.C.A. § 66-28-101 to -521. However, the legislature, knowing that the Pawnbrokers Act would interact and overlap with criminal statutes, specifically provided *criminal* punishments for violations of the Pawnbrokers Act. T.C.A. § 45-6-218(a). This leads us to the conclusion that the legislature intended the Pawnbrokers Act to be the exclusive means of prosecution of pawnbrokers acting within their official capacity, absent a specific exception like the Pawnbrokers Act's provision for a theft prosecution when a pawnbroker knowingly received stolen property.

These aforementioned considerations lead us to the conclusion that the legislature did not intend for a pawnbroker, such as Defendant, to be prosecuted for tampering with evidence in a scenario where a law enforcement official did not place a written hold order on an item that they believe to have been stolen and the pawnbroker sells the item, even if the pawnbroker knows that the item is subject to an investigation. The Pawnbrokers Act is directed specifically toward controlling the actions of a pawnbroker in his or her official capacity. The legislature turned their minds to addressing the various scenarios that could occur within a pawnshop when they passed the Pawnbrokers Act, and the general provisions of the tampering with evidence statute do not govern Defendant's

actions that were taken in his official capacity as a pawnbroker. Thus, we determine that Defendant was improperly charged for tampering with evidence.

*Conclusion*

For the aforementioned reasons, the judgment of the trial court is reversed and Defendant's conviction is vacated.

_____

TIMOTHY L. EASTER, JUDGE