# IN THE COURT OF APPEALS OF TENNESSEE
# MIDDLE SECTION AT NASHVILLE



**FILED**

**March 29, 2000**

**Cecil Crowson, Jr.
Appellate Court Clerk**

| | | |
|---|---|---|
| **ELVIN DWAYNE ROBINSON**, | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Appeal No. |
| | ) | M1999-00296-COA-R3-CV |
| vs. | ) | |
| | ) | Rutherford County Circuit Court |
| **NISSAN MOTOR MANUFACTURING** | ) | No. 39879 |
| **CORPORATION, U.S.A.**, | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

## APPEAL FROM THE RUTHERFORD COUNTY CIRCUIT COURT
## AT MURFREESBORO, TENNESSEE

### THE HONORABLE ROBERT E. CORLEW, III, CHANCELLOR

JOE BEDNARZ, JR,
Suite 1400, Parkway Towers
440 James Robertson Parkway
Nashville, Tennessee 37219
      Attorney for Plaintiff/Appellant

LARRY G. TRAIL,
107 North Maple Street,
Murfreesboro, Tennessee 37130
      Attorney for Defendant/Appellee

## AFFIRMED

                                      INMAN, Sr. J.

Concur:
CRAWFORD, P.J., W.S.
LILLARD, J.

This is an action for damages for asserted discharge from employment in retaliation for filing a workers' compensation suit. The motion of the defendant for summary judgment was granted. This appeal followed. The sole issue is whether summary judgment was properly granted.

Our review is *de novo* on the record with no presumption of correctness since the issue is one of law. *McCall v. Wilder*, 913 S.W.2d 150 (Tenn. 1995); *Tomlinson v. Kelley*, 969 S.W.2d 402 (Tenn. Ct. App. 1997); *McReynolds v. Cherokee Ins. Co.*, 896 S.W.2d 137 (Tenn. Ct. App. 1994).

# I

The plaintiff alleged (1) that he suffered a work-related injury on October 13, 1997,[1] (2) that he made a claim for workers' compensation benefit, (3) that the defendant retaliated against him by harassment, intimidation and discharge. The defendant denied any act of retaliation and alleged the plaintiff was discharged for insubordination, that being his refusal to perform assigned duties within his capability.

# II

A day job opened for a sealer deck position in Nissan's Paint Plant in October 1997. Plaintiff successfully sought this job. Three days later he reported that he had strained his lower back during the course of employment. His medical tests revealed no abnormalities but the attending physician imposed some temporary work restrictions.

---

[1]Which involved no permanent impairment or disability. He was initially employed on October 6, 1991. During the ensuring six years, he filed five (5) claims for workers' compensation benefits, none of which involved permanent impairment.

The plaintiff's area manager, Rodney Baggett, unilaterally determined that the plaintiff should not continue working in his home work group, and transferred him temporarily to a job Baggett believed was within his medical restrictions. This job was in the prime work group where the plaintiff previously had worked on the night shift.

Because Nissan's general practice is to assign employees outside of their work group for not more than 30 days, Rusty Krawchuk, Department Manager, Altima Plant, met with plaintiff and informed him that he was expected to return to his home group in sealer, which was short handed. Krawchuk also counseled plaintiff about his "uncooperative attitude" in not wanting to work on the sealer deck, pointing out that the job in the primer group was as strenuous as the work he had been assigned to perform in sealer. The purpose of this meeting was to let plaintiff know that he was expected to return to sealer in conformity with Nissan policy.

Following this meeting, plaintiff continued to work in prime for an additional week, allowing more time for his back to heal. On November 24, 1997, after plaintiff reported to Nissan Medical complaining of neck pain, he was placed on restriction and assigned to the color order job. The following day, he again reported to the medical clinic, and Nissan's physician, Dr. Moore, added the restriction of no overhead work, which was to remain in place until the plaintiff was examined by his treating physician, Dr. William Jekot. In light of this new restriction, Baggett assigned plaintiff to work on the blow and tack job in a third work group called Damp Sand I. After the plaintiff complained that he was unable to perform some of the job duties, Baggett called Nissan Medical personnel to evaluate the job. Wade Pinkard, Restricted Work Coordinator, thereupon studied the job and concluded that the plaintiff could not perform the required tasks.

On November 26, 1997, plaintiff reported to work with an "attending physician's report"

from Dr. Jekot, who imposed a lifting restriction of no more than 20 pounds, which Nissan interpreted as eliminating some of plaintiff's previous restrictions. As a consequence, plaintiff was assigned to his original job in sealer, which would accommodate a lifting restriction of no more than 20 pounds, but with no further limitations. Plaintiff refused to perform the sealer job. Baggett thereupon consulted with Nissan Medical, who concluded that Robinson could work on the sealer job with a 20 pound lifting restriction. This occurred at the end of the working day. Robinson then left work for the Thanksgiving holidays, following which Nissan Medical learned from Dr. Jekot's office that plaintiff had additional restrictions of no repetitive bending, stooping, lifting, or twisting.

On the following Monday, Baggett and other Nissan managers were advised of plaintiff's additional restrictions. In light of this new information, he was taken off the job in sealer, and returned to a job in the prime work group that Wade Pinkard believed was within the additional restrictions.

On December, 2, 1997, Baggett informed Tom Buchanan, Section Manager, that the sealer group was short of manpower. Because of the manpower needs in sealer and because the plaintiff was the only employee then working in prime who also was permanently assigned to sealer, Buchanan determined that Steve Klintworth, Occupational Health Nurse and Job Placement Coordinator, and Wade Pinkard should evaluate plaintiff's ability to perform a job in sealer that would be within his restrictions. This was the first time that Nissan Medical had reviewed the jobs in the sealer work group to determine whether the plaintiff, given his restrictions, could perform the job.

In response to Baggett's request, Klintworth and Pinkard assessed jobs in sealer and determined there were two jobs that Robinson could perform within his medical restrictions. The

-4-

plaintiff's medical restrictions - no continuous bending, stooping, lifting or twisting and no overhead work - comported with the job functions at Stations V and VI of the sealer deck.[2]

Because the plaintiff's medical evaluation indicated he could perform two jobs on the sealer deck, Larry Burks, Department Manager of Manufacturing Operations, transferred him out of the prime booth, where he was an "extra," to Station VI on the sealer deck, where Nissan was short handed. This was the first time that the plaintiff had been assigned to the Station VI job. Burks testified that he made this change because he needed "manpower on the sealer deck, . . . Dwayne [Robinson] was supposed to be on the sealer deck and there was medically no reason for him not to be on the sealer deck."

Plaintiff expressed reservations about performing the Station VI job in sealer and refused to work. He admits that he had no objective evidence that he would have had difficulty performing the job; rather, he refused to do the work based upon his perception of his abilities.

Patty Dixon, who at the time was Section Manager in Nissan's medical department, met with the plaintiff to discuss his concerns. She noted that he had no "outward signs" of pain. Rather, "he appeared to be relaxed and gave no signs of pain that I normally see in an individual that really was having severe pain. He was not grimacing, he was not stiff, he did not appear to have discomfort." She concluded that Robinson "should [have] be[en] able to perform that [Station VI] job . . . ." She testified ,

> I told him [Robinson] that I had reviewed his file and diagnosis and job restrictions, coordinators notes in the file and I felt that he should be able to and that it was in his best interest to try to perform the job, that it was part of his rehabilitation, that it was really much better for him to continue working.

---

[2]Mr. Pinkard videotaped the job to verify the assessment.

She also told the plaintiff, in effect, to try the job and "if he wasn't able to do that," she "would reconsider her position."

Tom Buchannan and Jim Bowles, Section Manager of Human Resources, also met with the plaintiff. Bowles testified that he "practically begged" Robinson to try the Station VI job and that Nissan "did everything we possibly could to get him [Robinson] to attempt to work." Bowles requested that the plaintiff return to work until the end of the shift at which time he could then see his doctor and have his restrictions altered if he could not do the job. At first, Robinson went to the sealer line and "performed two to three rotations on three or four units," but after a few minutes, he again said he could not do the job and refused to continue working. Area Manager, Rodney Baggett, testified that he considered the plaintiff's response as constituting a "refusal" to do the job.

Because plaintiff persisted in his refusal to perform the Station VI job, he was terminated on December 2, 1997 "for refusing to try and do a job that [the] medical department deemed that he was capable of doing. Insubordination." Department Manager Larry Burks explained the decision to terminate the plaintiff as follows:

> Someone has to do a job. If you refuse to do a job and you refuse to accomplish that job, then there is no reason for that employee to be there anymore, I mean if you're not going to try and do a job.

According to Section Manager Jim Bowles, one of the "important facts" that entered into Nissan's decision to terminate plaintiff was that "medical had talked to him" and plaintiff clearly understood that even with his restriction said he could do the job [in sealer]." Larry Burks also pointed out that if plaintiff had tried to do the job and had been unable to perform it because he was experiencing too much pain, "then he had another avenue" of going back to the medical department.

Plaintiff did not avail himself of this possible alternative. As emphasized by Burks, "I know that he [plaintiff] should have tried to do the job to see if he was in pain or not. I don't know how you determine he was in pain if he didn't try to do the job."[3]

## III

The foregoing recitation of the facts of this case is essentially undisputed subject to the caveat that the plaintiff insisted that he was not physically able to perform the assigned work. Such inability, he argues, was caused by his low back strain, and the insistence of his supervisors that he should nevertheless work was pretextual and in retaliation for making a workers' compensation claim.

In support of his admittedly subjective complaint that he could not do the work and thus was allegedly subject to the vengeance of his employer, he offered affidavits from former employees, typical of which is that of William Burk, who deposed that he was harassed, intimidated and then terminated because he filed a workers' compensation claim. He argues that in light of T.R.E. 406 which provides:

> . . . [E]vidence of a habit of a person or routine practice of a business
> is admissible to show that the actions of the person or organization
> are in conformity with the habit or routine practice on the date in
> question, . . .

superimposed upon his personal opinion of his inability to do the assigned job, a genuine issue of

---

[3]Tom Buchanan specifically informed Burks that Robinson "was not trying to do the job" on the sealer deck and that there were two instances in which Burks recalled that he had encouraged Robinson to do the sealer job, but Robinson refused. Later Buchanan and Jim Bowles tried again to encourage Robinson "to go back and try the job, at least try the job and see if he can do it or not and if he can not, then go back to medical and get a restriction."

a material fact existed which made summary judgment inappropriate pursuant to the teaching of *Byrd v. Holt*, 847 S.W.2d 208 (Tenn. 1993).

When the plaintiff protested that he was unable to perform the duties of the job to which he had initially been assigned, his employer had the "job considered by a number of professionals" who determined that the job was within the plaintiff's medical restriction. Various fellow workers and supervisors "directed and encouraged" the plaintiff to at least try to do the job, but he refused. He was thereupon terminated.

The trial judge found that whether he accepted the plaintiff's reason for refusing to work at the assigned job, or the defendant's reason for terminating the plaintiff, there was nevertheless no "basis for a finding that the plaintiff was terminated for filing a workers' compensation claim."

The trial judge then found that the plaintiff "cannot satisfy the initial requirement in a retaliatory discharge case in proving any connection between the workers' compensation claim and his subsequent termination", and dismissed the case.

## IV

The plaintiff insists that summary judgment was inappropriate because the evidence offered on the issue of whether the defendant pretextually terminated him for making a workers' compensation claim was material. To make the point, the plaintiff relies (1) upon his personal belief, and (2) the beliefs of other employees that they were terminated because they had made a claim for workers' compensation benefits.

When faced with the supported motion for summary judgment, the court 'allowed' the

plaintiff to take the discovery depositions of nine(9) employees of the defendant. Their testimony was not helpful to the plaintiff.[4]

When a non-movant claims there is a disputed material fact, the court, when so confronted, must examine the elements of the claim to determine whether the resolution of the factual issue will affect the disposition of the claim. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). Such a determination will resolve the issue of materiality.[5] But even if there is a material fact in dispute, the court must still evaluate whether the disputed material fact creates a genuine issue for trial. If the evaluation show that a reasonable trier of fact could resolve the issue only one way, summary judgment is proper. *Byrd, supra.* In *Caldwell vs. Nissan Motor Manufacturing Corp., U.S.A.*, 968 S.W.2d 863 (Tenn Ct. App 1997), we held, *citing Matsushita Elec. Indus. Co. Ltd. vs. Zenith Radio Corp.,* 475 U.S. 574 (1986), that

> . . . [T]he evidence of the non-moving party must show more than a mere metaphysical doubt as to material facts, must include competent and material evidence of the non-existence of facts assisted by the moving party and/or facts which effectively disentitles the moving party to summary judgment.

## V

To make a *prima facie* case for retaliatory discharge, a plaintiff must prove: (1) that he was an employee of the defendant at the time of the injury; (2) that he made a claim for workers'

---

[4]Following his termination, according to company policy, the plaintiff was afforded the opportunity to take advantage of the defendant's "peer review" process. Involved are three fellow employees and two Area Managers who determine if "there is some reason we should overturn the termination." A meeting was arranged, which the plaintiff declined to attend.

[5]The trial judge noted that although some facts may be disputed as to whether the plaintiff attempted to perform his job, these would be immaterial on the issue of causation.

compensation benefits; (3) that the defendant terminated his employment, and (4) that there was a causal nexus between the termination of his employment and his claim for workers' compensation benefits. *Anderson v. Standard Register Co.*, 857 S.W.2d 555 (Tenn. Ct. App. 1993). The issue for resolution is whether the plaintiff established the necessary element of causation required by Tennessee law. If circumstantial evidence is presented, it must be *compelling* on the issue that retaliation was a *substantial* factor in the decision to terminate the plaintiff. *Thomason v. Better-Bilt Alum. Prod. Inc.*, 831 S.W.2d 291 (Tenn. Ct. App. 1992).

Mere proof of discharge without evidence of a causal link between the workers' compensation claim and the discharge "does not present an issue for the jury." *Anderson*, at 558-559. To present an issue for the trier of fact, the plaintiff must prove that his claim for workers' compensation benefits was a *substantial factor* in his employer's motivation to terminate his employment, *Id.* at 558, and the burden of forging this causal link rest upon the plaintiff. *Id.* at 559.

Evidence of causation requires more than facts showing employment, the exercise of rights, and a subsequent discharge. *Thomason v. Better-Bilt Aluminum Products, Inc.*. 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992). For a plaintiff to prevail, there must be either direct evidence of causation or *compelling* circumstantial evidence. *Id.* If the plaintiff fails to present adequate evidence of causation, then summary dismissal is justified. As the Supreme Court has observed, the "failure of proof concerning an essential element of the cause of action necessarily renders all other facts immaterial." *Alexander v. Memphis Individual Practice Ass'n.*, 870 S.W.2d 278, 280 (Tenn. 1993).

Even if a plaintiff is able to muster sufficient direct or circumstantial evidence to allow the inference of a causal link between the claim for benefits and the plaintiff's subsequent discharge, that does not end the inquiry. The burden is shifted to the employer to come forward with "a legitimate,

non-pretextual reason for the employee's discharge." *Anderson* at 559.

Stated differently, causation does not exist if the basis for discharge is valid and not a mere pretext, even if the discharge is related or linked to a claim for benefits. *Id.* at 558. For example, an employer may fire an employee for excessive absenteeism, even though the absenteeism is caused by a compensable injury. *See Anderson* and cases cited therein. Other legitimate reasons include the employee's own shortcomings (such as tardiness, lack of skill, lack of truthfulness) and the employee's physical inability to do the job. *Anderson*, at 559 (citing A. Larson, *The Law of Workmen's Compensation*).

Where the employer presents a legitimate, non-discriminatory reason for the employment action, the burden shifts back to the employee to prove that the employer's explanation is pretextual or not worthy of belief. *Smith v. Bridgestone/Firestone, Inc.*, 1999 Tenn. App LEXIS 110 at *16 (Tenn. Ct. App. Feb. 23, 1999) (citing, *Devore v. Deloitte & Touche*, 1998 Tenn. App. LEXIS 122 at *12-13 (Tenn. Ct. App. Feb. 20, 1998). In doing so, the employee "must present specific admissible facts, which realistically challenge the defendant's stated reasons." *Hubrig v. Lockheed Martin Energy Sys.*, 1998 Tenn. App. LEXIS 303 at *24 (Tenn. Ct. App. May 4, 1998). *See also Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986); *Silpacharin v. Metropolitan Gov't.*, 797 S.W.2d 625, 629 (Tenn. Ct. App. 1990). The employee faces summary dismissal of his claims if he is unable to demonstrate that he could prove that the defendant's reason for the discharge was pretextual. *DeVore*, 1990 Tenn. App. LEXIS at *16-17. Thus, if the employee fails to make the required showing of pretext, the employer must prevail. *Id.*

As we have heretofore noted, the plaintiff presented no direct proof that he was terminated because he made a claim for workers' compensation benefits, and he presented no compelling

-11-

circumstantial evidence. *See, Thomas, supra.* He testified that he had nothing beyond his subjective feelings to support his claim, other than the beliefs of other employees who had been terminated. Subjective beliefs as to why he was dismissed do not create a genuine issue of material fact. *Newsom vs. Textron Aerostructures*, 924 S.W.2d 87 (Tenn. Ct. App. 1995)

Accordingly, we find that summary judgment was properly granted. The judgment is affirmed at the cost of the appellant.

_____
INMAN, Sr. J.

CONCUR:


_____
CRAWFORD, P.J., W.S.


_____
LILLARD, J.