Betty S. FRAZIER, Plaintiff/Appellee,

v.

HERITAGE FEDERAL BANK FOR SAVINGS and Federal Bank Shares, Inc., and now, pursuant to a plan of merger, First American Corporation and First American National Bank, Defendants/Appellants.

Court of Appeals of Tennessee, Eastern Section.

May 13, 1997.

Permission to Appeal Denied by Supreme Court Nov. 3, 1997.

Cecil W. Laws, Kingsport, for Plaintiff–Appellee.

John B. Phillips, Jeffrey S. Norwood and Raymond H. Hixson, Jr., Miller & Martin, Chattanooga, John S. Bryant and Karen L.C. Ellis, Bass, Berry & Sims, P.L.C., Nashville, and William T. Gamble, Wilson, Worley, Gamble & Ward, P.C., Kingsport, for Defendants–Appellants.

## OPINION

FRANKS, Judge.

In this action for damages, the Chancellor determined that plaintiff's employer had discriminated against plaintiff on the basis of age and sex, and awarded damages pursuant to the Tennessee Human Rights Act, (THRA) T.C.A. § 4–21–101 *et seq.* Defendants have appealed.

Plaintiff was born September 7, 1937, and began working at Heritage Federal Bank as a teller in 1959. She rose through the ranks over time, becoming a Senior Vice President in 1984. Her work encompassed many branches of the bank and primarily centered around customer service and teller supervision.

The nature of her work changed in June 1991, when an organizational restructuring of the bank took place. William Kreis replaced Wendall Kirk as President of the Bank. Plaintiff retained her Senior Vice President title but was moved from the Customer Service Department to Customer Relations. A younger man, Don Osborne, took over Customer Service. She testified that she understood her reassignment to be a "lateral"

move. Her annual performance evaluation that July contained some negative remarks but she received a salary increase.

In the spring of 1992, the bank was converted into a publicly held company. Unlike other senior management, plaintiff was not offered any of the benefits of the stock option plan or listed by name on the company's prospectus. That prospectus also showed that other executive officers were receiving salaries significantly higher than hers.

Between June and September of that year, she completed several special projects, but was not given any new assignments. She testified that she was excluded from meetings and could not get secretarial support. Her annual performance evaluation that September was more negative than in the past and stated that she had trouble working with people. She received no raise that year and her title was downgraded to Vice President. She no longer reported directly to the President of the bank.

In April of 1993, her office was moved from the executive suite to a downtown office and her portfolio of duties was narrowed. In March 1994, plaintiff's position as head of the Customer Relations Department was taken over by a 35 year-old woman, Della Walker. Plaintiff was put in charge of a newly created department supervising one employee and her office was moved to the basement floor.

Plaintiff filed suit on June 29, 1994, alleging violations of the Tennessee Human Rights Act (THRA) and the federal Equal Pay Act. In the trial before the Chancellor, the defendant was found to have violated the THRA by discriminating against the plaintiff on the basis of her age and gender. The Chancellor determined the discrimination had begun with the 1991 reorganization and continued until the lawsuit was filed. He assessed damages from May 22, 1992 and awarded $2,242,450.28 to the plaintiff.

Defendants insist the Chancellor erred in finding that plaintiff was discriminated against on the basis of age and sex. Under the THRA, it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." T.C.A. § 4-21-401(a)(1).

A prima facie case requires that the plaintiff demonstrate that he/she was a member of the protected class, was subject to an adverse employment action, was qualified for the position, and was replaced by a younger person. *McDonnell Douglas Corp. v. Green*[1], 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Brenner v. Textron Aerostructures*, 874 S.W.2d 579 (Tenn.App.1993). Once a prima facie case is shown, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Brenner* at 583. The burden then again goes back to plaintiff to establish that the employer's reason is a pretext or "not worthy of belief." *Id.*

The evidence does not preponderate against the Chancellor's finding that the plaintiff was the object of age and sex discrimination. T.R.A.P. Rule 13(d). Defendant's argument that plaintiff's demotions did not constitute "adverse employment decisions" as required for a prima facie case, because her salary was not reduced, is without merit. The constant reduction in her duties and prestige at the bank were "materially adverse changes" in her terms and conditions of employment sufficient to qualify as discriminatory actions. *See Kauffman v. Kent State Univ.*, 815 F.Supp. 1077, 1084 (N.D.Ohio 1993). The argument that Plaintiff was not qualified for the job that was taken away from her is not supported by the evidence of her years of experience in this position and the Chancellor rejected this out of hand, finding the evidence not to be credible.

The reasons offered by defendant for her demotions were her alleged difficulty working with people, which resulted in sub-

---

**1.** Federal case law is used in interpreting discrimination under the THRA, since the stated purpose and intent of the Tennessee Act is to execute the policies embodied within the federal anti-discrimination acts. T.C.A. § 4-21-101(a)(1). *Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884 (Tenn.1996).

stantial employee turnover. The Chancellor found that these impressions of plaintiff were due to the policies put in place by Bank President Kirk, specifically the policy of hiring "full-time part-time" tellers who worked fulltime but were not offered benefits. The Chancellor found that the plaintiff was not responsible for these problems and that the proffered reasons were pretexts. These findings are supported by the testimony of board members that plaintiff was not really considered part of the senior management and by the bank president Kreis that he felt she had risen as far as she was going to at the bank. The findings of the trial court that defendants violated THRA are supported by the evidence. T.R.A.P. Rule 13(d). *See Held v. Gulf Oil Co.*, 684 F.2d 427, 429 (1982).

Next, defendants insist that the Chancellor erred in applying the "continuing violation" theory to extend relief to plaintiff, which would otherwise be barred by the statute of limitations.

■ The concept of the "continuing violation" has been adopted by Tennessee from federal case law, as a means for dealing with discrimination which may not be immediately apparent to the victim. *Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884, 889 (Tenn. 1996). The doctrine of continuing violations provides that a plaintiff may be granted relief for a time-barred act by linking a series of related acts, one or more of which falls within the limitations period. *Spicer* at 886; *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The Tennessee Supreme Court explained the reasons which courts have given for adopting this doctrine:

First, they emphasize that Title VII is a remedial statute designed to eliminate discrimination and make parties whole. Second, they stress that employees are generally lay people and are unaware that they must act quickly or risk losing their cause of action. Often employees fear reprisal or turn to others for help, and in so doing, delay action on their cause until the statute has expired. Finally, and perhaps most importantly, those courts recognize that many discriminatory acts cannot be viewed as discrete incidents, and often unfold rather than occur, making it difficult to precisely pinpoint the time when they take place.

*Spicer [*937 S.W.2d] at 889.

■ The crucial issue is whether the nature of the discriminatory acts were "not apparent when they were committed but became so when viewed in the light of the later acts." *Moskowitz v. Trustees of Purdue University*, 5 F.3d 279, 282 (7th Cir.1993).

■ The limitations period for filing suit when plaintiff instituted this action was contained in T.C.A. § 4–21–311(d), which required that suit be filed "within one (1) year after the alleged discriminatory practice ceases." [2] Plaintiff's action was filed on June 29, 1994, and to establish that her suit was timely filed, she had to prove that a discriminatory act occurred on or after June 29, 1993. She has met this requirement, in the form of the March 1994 demotion from the head of Customer Relations Department to work that can be described as clerical.

■ The question thus becomes whether the earlier violations can be "linked"[3] to this

2. Appellant and Appellee both spend portions of their brief arguing regarding which statute of limitations would apply. In the past, THRA cases had used T.C.A. § 28–3–104(a), the general statute of limitations on personal tort actions. Actions were required to be brought within one year after the cause of action accrued. The THRA was then amended to include its own limitations period, as quoted above. T.C.A. § 4–21–311(d) (Supp.1996). The amended statute went into effect on May 22, 1992. As Plaintiff's complaint asked for relief for incidents after this point, her case is covered by this amendment.

Note that this determination is does not effect the outcome of the case because both limitations

periods are for one year and both incorporate the continuing violation theory, either through case law (T.C.A. § 28–3–104(a)) or implicit in the statutory language (T.C.A. § 4–21–311(d)) *Spicer*, 937 S.W.2d 884, n. 6; *Weber v. Moses*, 938 S.W.2d 387, n. 4 (Tenn.1996).

3. *Spicer* discussed two branches of the continuing violation doctrine. The first category is found where there is evidence of present discriminatory activity, for example where disparate work assignments or pay rates are imposed on similarly situated employee groups. This category is sometimes called "serial" continuing violations. The second category is used where there has been a longstanding and demonstrable policy

1994 demotion. The inquiry is whether the earlier acts were "related closely enough to constitute a continuing violation" or were "merely discrete, isolated, and completed acts which must be regarded as individual violations." *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983). To make this distinction, *Spicer* cited approvingly of the factors put forth in *Berry:*

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry* at 981.

The importance of the third factor has been stressed, as a court examines:

> What justifies treating a series of separate violations as a continuing violation? Only that it would have been unreasonable to require the plaintiff to sue separately on each one. In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe he was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment.

*Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989).

Although the Chancellor found that the discrimination began with the June 1991 reorganization of the bank, it is clear that plaintiff was not then aware that her change of position was the result of discrimination. She understood the move to be "lateral" in

nature and received an increase in salary that year.

Her feelings that all was not well with her employment situation began in January 1992, when she was not named in the company prospectus and learned that her salary was significantly lower than others in senior management. She knew that there was a problem by September of 1992, when her title was downgraded from Senior Vice President to Vice President, and she was no longer being given assignments and was being excluded from meetings, and secretaries assigned to her were doing others' work instead. She received a negative performance evaluation, and was no longer to report to the President of the bank. Although she knew her 55th birthday was coming up and looked into the retirement benefits for which she would be eligible, at this point no member of senior management had initiated a discussion of her retirement or mentioned her age as a liability.

It was not until approximately August of 1993, when her office had been moved from the executive suite to a downtown office and her portfolio of duties had been changed and narrowed again, that she was pressured to retire. This pressure took the form of the bank president's secretary repeatedly asking her if she was going to retire. It also occurred when she had a conversation with her supervisor in which she stated that these actions looked like another demotion and that it was obvious that they wanted to "get rid" of her. Her supervisor's response was "[o]h, I just happen to have that retirement paper that was talked about earlier." This is the point at which she could be deemed aware of the discriminatory nature of her demotions. *See Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ.*, 926 F.2d 505 (6th Cir.1991) ("a court should determine what event should have alerted the average lay person to protect his rights", *quoting Conlin v. Blanchard*, 890 F.2d 811, 815 (6th Cir.1989)); *cf. Egan v. Palos Community Hospital*, 889 F.Supp. 331 (N.D.Ill.1995) (no

---

of discrimination, such as an established pattern of paying men more than women. This category is sometimes called a "systemic" violation. Plaintiff's claim does not present evidence of an

overreaching policy on the part of the bank. Therefore, we must determine whether it meets the criteria for a serial violation.

continuing violation to save age discrimination claim where plaintiff was put on notice of the problem early on in her employment by supervisor's remarks that "a lot of changes had to be made and that only young people could make changes.").

Using the more specific Berry analysis, the alleged acts do involve the same type of discrimination, a series of demotions. The steady recurrence of the acts, is less favorable to plaintiff, as the demotions took place in an irregular fashion over 4 years. However, the third and most important factor, the degree of permanence triggering an employee's awareness and duty to assert his/her rights, is not established until the August 1993 retirement discussion. Although the previous actions by the bank were not particularly temporary in nature, she had no reason to assume that hard work would not turn the situation around. *Glass v. Petro–Tex Chemical Corp.,* 757 F.2d 1554, 1562 (5th.Cir.1985). The Chancellor characterized the discrimination as "gradual and insidious", and we conclude her duty to assert a discrimination case was not triggered until she knew that her age and gender had played a role in the demotions. *Id. Accord Vakharia v. Little Co. of Mary Hosp.,* 917 F.Supp. 1282, 1294 (N.D.Ill.1996); *cf. Berry* (plaintiff was aware of and believed that sex discrimination was the reason for the university's practices for years before she filed suit).

We believe plaintiff's situation is one in which the continuing violation theory is justified, i.e., where the plaintiff is unaware that he/she is the victim of discrimination until several discriminatory acts have already taken place. *See Malhotra* at 1310.

■ Damages can be assessed for conduct that was part of the continuing violation and occurred outside the limitations period. *Berry* at 980; *Sabree v. United Brotherhood of Carpenters and Joiners Local No. 33,* 921 F.2d 396, 401 (1st Cir.1990).; *McKenzie v. Sawyer,* 684 F.2d 62, 72 (D.C.Cir.1982); *Ferner v. Village of Sheffield,* 656 F.Supp. 1017 (N.D.Ohio 1987). The remedy should represent a reasonable attempt to restore plaintiff to a position where she would have been, absent the unlawful discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

■ The Trial Court based its assessment of damages on a comparison with the compensation received by Don Osborne, the employee who took over plaintiff's department in the 1991 reorganization. This compensation included the differences in their salaries of $328,366 [4]. Stock options, stock grants, a severance package, and retirement benefits, were awarded in the amount of $1,598,856.[5] Damages were also awarded for humiliation and embarrassment, in the amount of $50,000.00, and for attorney's fees of $264,228.28. Prejudgment interest and front pay were not awarded. The total award was $2,241,450.28.

These assessments were based on the testimony of Plaintiff's witness, Nathan Botts, who reviewed financial statements and testified as to the compensation received by Don Osborne. Defendants argue that evidence of damages are speculative. However, we cannot agree and find that the evidence does not preponderate against the assessment of damages by the Chancellor. *Loveday v. Barnes,* 909 S.W.2d 448 (Tenn.App.1995); *Jennings v. Hayes,* 787 S.W.2d 1 (Tenn.App.1989) (speculative damages are prohibited when the existence of damages is uncertain, not when the amount of the damage is uncertain.)

■ Plaintiff also raises issues as to the damages, and claims that the Trial Court erred in not awarding a consulting payment earned by Osborne, prejudgment interest,

4. This figure incorporated the differences in the Frazier and Osborne salaries for the second half of 1992, all of 1993 and 1994, and eleven-twelfths of 1995. This time period corresponds with Frazier's 1992 demotion to the 1995 merger of Heritage Federal and First American.

5. This figure has also been prorated to exclude the first half of 1991 and last month in 1995. The Trial Court calculated this proration by taking the number of months for which Frazier should have been granted the compensation (June 1992 to Nov. 1995 = 42 months) and the number of months in which Osborne received the compensation (July 1991 to Nov. 1995 = 53 months). The total value of the compensation ($2,017,600) was multiplied by 42/53 to reach the award of $1,598,856.

and front pay. The determination not to award damages for the consulting agreement is a finding of fact entitled to a presumption of correctness and is not preponderated against on our review. *Loveday.* The decision not to grant prejudgment interest is within the sound discretion of the trial court and will not be disturbed on appeal unless the record reveals a manifest abuse of discretion. *Spencer v. A–1 Crane Service, Inc.*, 880 S.W.2d 938 (Tenn.1994). No abuse of discretion is found on this record. The Chancellor refused to grant front pay because he determined that the harm ended with the 1995 merger of Heritage Federal and First American. Front pay may be granted where reinstatement is not feasible. *Coffey v. Fayette Tubular Products,* 929 S.W.2d 326, 332 (Tenn.1996). But an award of front pay is limited by the "estimated remaining tenure plaintiff would have enjoyed with his company absent the discriminatory conduct." *Sandlin v. Corporate Interiors, Inc.,* 972 F.2d 1212, 1215 (10th Cir.1992). Given the elimination of Heritage as a corporate entity, we find no basis to reverse the Chancellor on this issue.

Accordingly, the judgment of the Chancery Court is affirmed with costs of the appeal assessed to appellants and the cause remanded.

McMURRAY and SUSANO, JJ., concur.