IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2005 Session

## ANTOINETTE CHRISTINE REGNIER v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal from the Chancery Court for Davidson County**
**No. 00-2212-I     Claudia Bonnyman, Chancellor**

---

**No. M2004-00351-COA-R3-CV - Filed May 11, 2006**

---

Police officer filed a sexual harassment retaliation claim under the THRA against the Metropolitan Government of Nashville and Davidson County as a result of her transfer from an instructor at the Police Training Academy to patrol duty. A jury found that Metro had engaged in retaliation in violation of the THRA and awarded Plaintiff $150,000 in damages in addition to $110,180.70 in costs and attorney's fees. Metro filed a motion for judgment as a matter of law, new trial, or remittitur, which was denied by the trial court. Metro appeals claiming that Plaintiff failed to prove, as a matter of law, that her transfer was an "adverse employment action" as required by the THRA or in the alternative, that the amount of the award should be reduced. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

---

WILLIAM B. CAIN, J., delivered the opinion. William C. Koch, Jr., P.J., M.S., filed a separate concurring opinion. PATRICIA J. COTTRELL, J., did not participate.

Karl F. Dean, Director of Law, The Department of Law of the Metropolitan Government of Nashville and Davidson County, Lora Barkenbus Fox, John L. Kennedy, Nashville, Tennessee, for the appellant, The Metropolitan Government of Nashville and Davidson County.

David G. Ridings, Goodlettsville, Tennessee, for the appellee, Antoinette Christine Regnier.

### OPINION

The issue on this appeal presents a question that appears deceptively simple: whether a police officer's non-disciplinary reassignment from the police training academy to patrol duty without a reduction in pay, rank, or benefits is an "adverse employment action" constituting an element of retaliation under the Tennessee Human Rights Act, Tennessee Code Annotated section 4-21-101 *et seq*. ("the THRA").

Sergeant Regnier, a former instructor at the Police Training Academy ("the Academy"), sued the Metropolitan Government of Nashville and Davidson County ("Metro") and others arising from alleged sexual harassment and her reassignment to patrol duty. Prior to the trial, all of her claims were dismissed with the exception of her retaliation claim under the THRA against Metro. Sergeant Regnier claims she was transferred from her position as an instructor at the Academy to patrol duty in retaliation because she reported that one of her superior officers at the Academy had engaged in sexual harassment.

After a lengthy trial, a jury found that Metro engaged in retaliation prohibited by the THRA when it transferred Sergeant Regnier. Sergeant Regnier was awarded $150,000 in damages plus $110,180.70 in costs and attorney's fees. Metro then filed a Motion for Judgment as a Matter of Law, New Trial or Remittitur which was denied by the trial court. Metro appeals alleging that as a matter of law the proof offered by Sergeant Regnier failed to demonstrate that the transfer was an "adverse employment action" which is a required element of the THRA. Alternatively, Metro argues that the amount of the award should be reduced.

## I. FACTS

Since the sole issue on appeal regarding liability is whether Sergeant Regnier's transfer was an adverse employment action under the THRA governing retaliation, it is not necessary to recite the facts in detail supporting the other elements of Sergeant Regnier's claim. Suffice it to say that there is no dispute that Sergeant Regnier reported sexual harassment by a superior officer to the commanding officer at the Academy and that the person who made the decision to reassign her was aware of this fact. Therefore, we will focus primarily on portions of the record pertaining to her reassignment.

Sergeant Regnier joined the Metropolitan Police Department in January of 1993 and upon completion of six (6) months training at the Academy and probation, was assigned to patrol duty. Her first patrol assignment was with a unit then called the Night Walkers which targeted high crime areas. After three (3) years with the Night Walkers unit, she applied for and was accepted into the Bicycle Unit where she served for about two (2) years. Sergeant Regnier testified that she thoroughly enjoyed her two patrol positions. After applying for a position at the Academy, she also applied for a promotion. When she was promoted to sergeant, she was transferred to the Academy in July of 1998.

The Academy provides training both for new recruits and in-service training for on-duty police officers. While at the Academy, Sergeant Regnier's primary responsibility was to provide in-service training to existing officers. She testified that she became certified to teach all of the classes offered at the Academy. Sergeant Regnier testified that a position at the Academy was prestigious and that she considered her opportunity at the Academy to be an honor. Her work hours at the Academy were from 7:30 a.m. to 4:00 p.m. Monday through Friday, with weekends off. While at the Academy, Sergeant Regnier attended the Nashville School of Law at night and subsequently graduated in 2000.

In October of 1998, Sergeant Regnier reported to Captain Schiele, head of the Academy, that her immediate supervisor, Lieutenant Carter, had made inappropriate remarks that constituted sexual harassment. After reviewing Metro's policy, Captain Schiele and Sergeant Regnier decided to handle the matter informally. The matter was addressed by requiring all staff, including Lieutenant Carter, to participate in a sexual harassment seminar. Sergeant Regnier agreed with this approach. To Sergeant Regnier's knowledge, Captain Schiele did not confront Lieutenant Carter with the allegations. It is undisputed that the informal process was successful and Lieutenant Carter stopped making the inappropriate remarks.

Later that month, when Lieutenant Carter somehow found out about Sergeant Regnier's complaint, he confronted her and Captain Schiele. Lieutenant Carter called Sergeant Regnier's husband, who is also a police officer, to apologize for his behavior. Lieutenant Carter also apologized to the entire staff for his behavior at the end of October, 1998.

At the beginning of 1999, Sergeant Regnier testified that she noticed that a lot of people were unhappy about how Captain Schiele ran the Academy. As a part of this unrest, she believed Lieutenant Carter was trying to put a wedge between her and the other staff by saying that Captain Schiele preferred her to the other officers. In March of 1999, while Captain Schiele was out of town, Lieutenant Carter called a meeting of staff to say that he was tired of the "rumors" about his intentions with Sergeant Regnier, and he denied any personal interest in her.

A couple of days later, Lieutenant Carter again called a staff meeting in which he confronted Sergeant Regnier, causing a scene and accusing her of lying. As a result of this incident, Sergeant Regnier was removed from Lieutenant Carter's chain of command. Lieutenant Carter later apologized for his behavior in March or April of 1999.

Thereafter, in July of 1999 after serving at the Academy for approximately one (1) year, the police transfer list came out and Sergeant Regnier learned that she was being transferred to patrol duty.

After receiving the news of her transfer, Sergeant Regnier complained to Captain Schiele and the Chief of Police that she believed her transfer was in retaliation for her report on Lieutenant Carter because just prior to her transfer, she had received good performance evaluations. In August, Sergeant Regnier met with then Assistant Chief Deborah Faulkner to complain. At that meeting, Assistant Chief Faulkner told Sergeant Regnier that she was being transferred to bring "fresh blood" into the Academy, that she was a good officer, and that more time on patrol would advance her career. At trial, Assistant Chief Faulkner explained that she wanted to rotate people in and out of the Academy.

Thereafter, Sergeant Regnier was transferred to patrol originally on the 2:30 p.m. to 11:00 p.m. shift. Sergeant Regnier testified that when an officer is transferred mid-year, the shift options are limited because assignments have already been made and preference is done by seniority. Due to the fact that Sergeant Regnier was attending law school at night, however, at her request she was

moved to the midnight shift. She was assigned as the extra sergeant on that shift and had no officers assigned to her. According to Sergeant Regnier, because of her transfer she lost a "ton" of responsibility, *i.e.*, she went from training the entire police department to being a "substitute" sergeant.

At the trial, then acting Chief Faulkner testified that the reasons she gave Sergeant Regnier in their August 1999 meeting were not the true reasons for her transfer. According to Chief Faulkner's trial testimony, Sergeant Regnier was transferred due to unprofessional conduct at the Academy such as the Sergeant's failure to wear the appropriate uniform at the Academy, her profane outburst while on the gun range, her frequent closed door meetings with her captain at the Academy, and other types of incidents.

All witnesses who testified on the subject agreed that serving in patrol is a more dangerous assignment than teaching at the Academy. Acting Chief Faulkner testified without contradiction that the primary role of the police force is performed by patrol units.

Acting Chief Faulkner testified that since the police force is akin to a para-military organization, no permanent positions are available. Unlike many other types of organizations, the police department must provide services 24 hours a day, 7 days a week and it must be staffed according to work load and demand. Therefore, when transfers are made, the staff is not typically consulted. While others testified that working at the Academy may be considered a preferred position, Chief Faulkner asserted many officers prefer to stay in patrol. Sergeant Regnier agreed that most officers work in patrol. Furthermore, if promoted, an officer typically is transferred to patrol in order to work at the new rank. This is true because the number of officers promoted are directly related to the needs of the patrol division. Far from being a demotion, Chief Faulkner explained that due to the possibilities arising from overtime and court duty, officers on patrol have the opportunity to make more money. For these reasons, Acting Chief Faulkner explained that Sergeant Regnier's transfer was not a demotion. The former head of the Academy, Captain Schiele, testified that positions at the Academy may be considered more prestigious but that patrol duty is important, demanding, and the "backbone" of the department.

## II. STANDARD OF REVIEW

At the close of plaintiff's proof, Metro moved for directed verdict in accordance with Tennessee Rule of Civil Procedure, Rule 50. Later, after the jury rendered its verdict, Metro made a post-trial motion for judgment as a matter of law. If a motion for directed verdict is not granted, then the case is deemed to have been submitted to the jury subject to a later determination of the legal question raised by the motion. Tenn. R. Civ. P. 50.02; *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 130 (Tenn.2004). Therefore, when the jury's verdict rests on an error of law, the party who moved for directed verdict may ask the court to set aside the verdict and enter a judgment in accordance with the motion for directed verdict. *Mercer*, 134 S.W.3d at 130. The standard to be applied by the trial and appellate court is the same. *Mercer*, 134 S.W.3d at 130.

[T]he trial court and appellate court are required to take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence.

*Mercer*, 134 S.W.3d at 130-31.

Metro contends that it is entitled to a directed verdict as a matter of law on Sergeant Regnier's retaliation claim because her transfer to patrol duty was not an adverse employment action within the meaning of the THRA. Metro does not dispute the factual predicate supporting the jury's findings but maintains, rather, that the facts do not constitute an adverse employment action as a matter of law. Whether or not a given set of facts establishes an adverse employment action is a question of law. *See White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795-96 (6th Cir.2004); *Moore v. City of Columbus*, 129 Fed. App'x 978, 980-81 (6th Cir.2005). In determining whether Metro is entitled to a directed verdict, we must first discuss the meaning of "adverse employment action" for purposes of a THRA retaliation claim.

## III. ANALYSIS

### A. Adverse Employment Action as Element of Retaliation Claim

Like many civil rights statutes, the THRA both prohibits discrimination based on certain characteristics, *i.e.*, race, gender, and religion and prohibits retaliation for invoking its provisions. The sole issue at trial, however, was whether Sergeant Regnier's transfer was done in retaliation as prohibited by the THRA. The THRA prohibits employers from retaliating against an employee who "has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing" under the THRA. Tennessee Code Annotated section 4-21-301(1). In order to be successful on a claim for retaliation under the THRA, Sergeant Regnier must prove the following four elements:

(1)  that plaintiff engaged in an activity protected by the THRA;

(2)  that the defendant had knowledge that plaintiff exercised the activity protected by the THRA;

(3)  that defendant took an employment action adverse to the plaintiff and;

(4)  that a causal connection exists between the protected activity and the adverse employment action.

*Mountjoy v. City of Chattanooga*, No. E2001-02017-COA-R3-CV, 2002 WL 707467, at * 3 (Tenn. Ct.App. April 23, 2002); *Austin v. Shelby County Gov't*, 3 S.W.3d 474, 480 (Tenn.Ct.App.1999).

Metro does not dispute that the first two elements are present under the facts of this case, *i.e.*, that by reporting sexual harassment, Sergeant Regnier engaged in activity protected by the THRA and that Metro was aware of it.[1]  The only challenge to liability Metro raises on appeal is that Sergeant Regnier failed to prove that Metro took any adverse employment action against her, *i.e.*, that her transfer does not satisfy the third requirement of her *prima facie* case.

The facts of this case present us with two legal questions that are determinative of its outcome. The first question concerns how to define adverse employment action under the THRA when retaliation is alleged.  While our Supreme Court has provided guidance on the parameters of an adverse employment action when discrimination is alleged, it has not yet done so when retaliation is alleged.  Second, since adverse employment actions usually consist of termination or a loss of pay, title or benefits, our courts have not found it necessary to focus attention on the standard to be used when there is no clear economic damage.  In this case, however, we are presented squarely with the issue of whether a transfer with no loss of pay, rank, or benefits is an adverse employment action for the purposes of establishing retaliation under the THRA.

In order to address these issues, we must first determine how to define adverse employment action, *i.e.*, what standard is to be used to determine whether a transfer is an adverse employment action that satisfies the third prong of the *prima facie* case of retaliation.  The THRA does not provide a statutory definition of adverse employment action to be used to establish either unlawful discrimination or retaliation.[2]  Once we establish the applicable standard, then we will turn our attention to the ultimate question of whether Sergeant Regnier's proof meets this standard.

## B.  Meaning of Adverse Employment Action

### a)  Tennessee Law On Adverse Employment Action

While the Tennessee Supreme Court has not discussed the definition of adverse employment action in the context of retaliation, it has done so when discrimination is alleged as in *Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698 (Tenn.2000).  Retaliation was not an issue in *Barnes*. Plaintiff, who suffered from Bell's Palsy, sued his employer alleging that he was terminated from his job because of his handicap in violation of the Tennessee Handicap Act, Tennessee Code Annotated section 8-50-103 ("the THA").  The THA embodies the definitions and remedies in the THRA.  *Barnes*, 48 S.W.3d at 706; *Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 420 (Tenn.1998).  Therefore, our Supreme Court's interpretation of an adverse employment action under the THA is likewise applicable to what constitutes an adverse employment action under the THRA.

---

[1]Presumably because Metro claims there was no adverse employment action then Metro does not discuss in detail the jury's finding on the fourth element, *i.e.*, that Sergeant Regnier was transferred because she reported sexual harassment by her superior officer.

[2]In order to establish a *prima facie* case of discrimination under the THRA, one element requires that the plaintiff must prove he or she suffered an adverse employment action.

We must now address whether the plaintiff suffered an adverse employment action. An adverse employment action, as contemplated by the THA, is a material and adverse change in the terms and conditions of employment. *See generally Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Crady v. Liberty Nat'l Bank & Trust of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). The following is a non-exhaustive list of adverse employment actions: termination of employment; demotion evidenced by a decrease in wage or salary, by a less distinguished title, or by a material loss of employment benefits; or a significant reduction of material responsibilities. *Crady*, 993 F.2d at 132; *see also DiMeglio v. Haines*, 45 F.3d 790, 804 (4th Cir. 1995) (indicating a reprimand and reassignment may constitute an adverse employment action); *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (stating dramatic downward shift in skill level required can constitute an adverse employment action); *Goodwin v. Circuit Court of St. Louis County, Mo.*, 729 F.2d 541, 547 (8th Cir. 1984) (holding transfer, with the same pay, from hearing officer to staff attorney was adverse because less prestigious); *Frazier v. Heritage Fed. Bank for Savings*, 955 S.W.2d 633, 636 (Tenn. Ct. App. 1997) (noting reduction in duties and prestige were "materially adverse changes" in terms and conditions of employment).

*Barnes*, 48 S.W.3d at 707.[3]

Two opinions from the Seventh Circuit Court of Appeals deal specifically with lateral transfers of police department personnel. In *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir.2004), Plaintiff was "transferred from her position as 'administrative sergeant' in the Narcotics Unit to the position of 'beat sergeant' in one of the districts." 392 F.3d at 910.

In upholding summary judgment for Defendant, the court held:

By definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions. To sustain a federal employment discrimination suit, a plaintiff must show something more than the ordinary difficulties associated with a job transfer. *See Conley*, 215 F.3d at 712 ("A materially adverse change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (quoting *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932 (7th Cir.1996)). As we have stated before, "being shifted to an essentially equivalent job that [an employee does] not happen to like as much does not a Title VII claim create." *Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir.2000) (rejecting plaintiff's argument that being "moved from an interesting job she liked that involved overseeing several other people to a boring job she didn't

[3]It is worth noting that the Supreme Court in *Barnes* cited favorably numerous cases under Title VII, the THRA's federal counterpart, particularly cases from the Seventh Circuit Court of Appeals.

like and that lacked any supervisory duties" was an adverse employment action); *McKenzie v. Milwaukee County*, 381 F.3d 619, 625-26 (7th Cir.2004) (finding that police officer's transfer from position as undercover detective in Drug Enforcement Unit to non-investigatory position in courts and auxiliary bureau did not constitute an actionable adverse employment action).

> O'Neal's complaints about the transfer reveal only a "purely subjective preference for one position over another," which does not "justify trundling out the heavy artillery of federal antidiscrimination law." *Herrnreiter*, 315 F.3d at 745.

*O'Neal*, 392 F.3d at 913.

In *McKenzie v. Milwaukee County*, 381 F.3d 619 (7th Cir.2004), Plaintiff was transferred from an undercover agent to the patrol bureau in the Milwaukee County Sheriff's Department. In affirming summary judgment for Defendant, the court held:

> Turning to McKenzie's Title VII disparate treatment claim, she must show, among other elements, that she suffered an adverse employment action. *See Tart v. Ill. Power Co.*, 366 F.3d 461, 472-73 (7th Cir.2004); *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743-44 (7th Cir.2002). Adverse employment actions include a broad array of actions such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S.742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To be actionable, an employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir.2002). The district court concluded that McKenzie failed to make out an adverse employment action because the most she could show was a lateral transfer without any change in pay or benefits.

> On appeal, McKenzie argues that her transfer was in fact a demotion. She suggests that her reassignment constituted an adverse employment action because "she was reassigned from somewhere she wanted to work," but, as we have held, a transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another. *Herrnreiter*, 315 F.3d at 745.

*McKenzie*, 381 F.3d at 625.

Therefore, our Tennessee Supreme Court has adopted what is commonly referred to as the "material and adverse change" definition of adverse employment action when the issue is

discrimination.[4]  While our Supreme Court has adopted the "material and adverse change" standard in the context of proving discrimination, our Court has not indicated whether this definition would apply in the context of proving retaliation.  Upon review, we were unable to find case law in Tennessee interpreting the THRA's definition of adverse employment action in the context of retaliation.

### b) Federal Guidance On Adverse Employment Action

It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts.  Tennessee Code Annotated section 4-21-101(a)(1); *Barnes*, 48 S.W.3d at 705; *Frazier v. Heritage Fed. Bank for Sav.*, 955 S.W.2d 633, 636 fn. 1 (Tenn.Ct.App.1997); *Newsom v. Textron Aerostructures, a Div. of Avco, Inc.*, 924 S.W.2d 87, 96 (Tenn.Ct.App.1995).  While we may look to federal law, we are neither bound nor restricted by it.  *Barnes*, 48 S.W.3d at 705.  The elements to prove a retaliation claim under Title VII are the same elements required under the THRA, including the requirement that a plaintiff show that he or she has been subjected to an adverse employment action.[5]  *Miller v. City of Murfreesboro*, 122 S.W.3d 766, 775 (Tenn.Ct.App.2003); *Austin*, 3 S.W.3d at 480; *Newsom*, 924 S.W.2d at 96.

Given that Tennessee courts have not spoken definitively on what constitutes an adverse employment action when retaliation is alleged, we can, therefore, look to the federal courts for guidance.  While the federal courts have given a great deal of attention to this particular issue,

---

[4]Some federal circuits take a rather narrow and restrictive view and limit the definition of adverse action to mean only employment actions that are "ultimate employment decisions" such as hiring, granting leave, termination, promoting and compensation.  *See Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997) ("loss of status and prestige" resulting from staff reassignment not ultimate employment decision intended to be actionable under Title VII); *Mattern v. Eastman Kodak, Co.*, 104 F.3d 702, 707 (5th Cir.1997) *cert. den.* 522 U.S. 932, 118 S.Ct. 336 (1997) (Title VII designed to address ultimate employment decisions).  The Sixth Circuit at one time indicated that only ultimate employment decisions qualified as adverse employment actions.  *White*, 364 F.3d at 801; *See Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542 (6th Cir.1999) (intermediate tenure decisions cannot form basis of Title VII claim) but this interpretation was repudiated by the Sixth Circuit in *White*, 364 F.3d at 802.  Obviously, the "ultimate employment decision" standard is a very restrictive interpretation which has not been adopted by our Supreme Court in *Barnes* as evidenced by the Court's inclusion in its non-exhaustive list of adverse employment actions reprimand and reassignment.  *Barnes*, 48 S.W.3d at 707.

[5]The Title VII provision prohibiting retaliation makes it unlawful for an employer to discriminate against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII.  42 U.S.C.A. § 2000e-3(a).  The language in the THRA, Tennessee Code Annotated section 4-21-301(1), governing retaliation *supra*, is virtually identical to Title VII.

unfortunately, the circuits are divided on how adverse employment action should be interpreted when the issue is retaliation.[6]

Some federal circuits have been willing to recognize that the definition of adverse employment action for purposes of establishing retaliation should be different than how it is defined when establishing a *prima facie* case of discrimination. For example, the Ninth Circuit expressly adopted the Equal Employment Commission's ("the EEOC") suggested definition of adverse employment action in the context of retaliation to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir.2000). This broad definition is generally referred to as the "likely to deter" standard. Another circuit likewise scuttled altogether the focus on whether the act is an adverse employment action, but instead focuses on whether there was a retaliatory motive behind the act. *See Passer v. Am. Chem. Soc'y*, 935 F.2d 322, 331 (D.C. Cir.1991) (employer's cancellation of public symposium in employee's honor could be an action taken by an employer that has an "adverse impact").

### c) **The Sixth Circuit's Decision in** *White v. Burlington Northern & Santa Fe Railway*[7]

The Sixth Circuit, *en banc*, has recently had an opportunity to thoughtfully discuss the split among the various circuits on this issue and to decide what constitutes an adverse employment action in a retaliation claim under Title VII in *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir.2005). We find this opinion particularly instructive because it reflects the reasoning of our Supreme Court in *Barnes* while also deciding the issue of how adverse employment action should be defined in a retaliation context which has not yet been decided by the Tennessee Supreme Court.

As a preliminary matter, the Sixth Circuit in *White* discussed the reasons for the judicial creation of adverse employment action as an element of a *prima facie* case of discrimination under Title VII. Like the THRA, Title VII does not explicitly provide the elements of a *prima facie* case of discrimination and provides no definition of the phrase "discriminate against" which is found throughout Title VII. *White*, 364 F.3d at 795. The courts, however, have made it clear that "not just any discriminatory act" by an employer violates Title VII. *White*, 364 F.3d at 795. (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268 (1998)).[8] It has consistently been

---

[6] *See* Joan M. Savage, *Adopting the EEOC Deterrence Approach to the Adverse Employment Action Prong in a Prima Facie Case for Title VII Retaliation*, 46 B.C.L. Rev. 215, 216 (December 2004) ("federal circuit courts of appeals are divided on what types of retaliatory actions an employer can be liable for taking, that is, what constitutes an adverse employment action").

[7] The United States Supreme Court on December 5, 2005, granted an application for a writ of certiorari in this case, 126 S.Ct. 797 (2005).

[8] In *Burlington Indus., Inc. v. Ellerth*, the Supreme Court had the opportunity to discuss this element of the *prima facie* case. While most courts refer to this concept as "adverse employment action," the Supreme Court refers to this concept as "tangible employment action." *White*, 364 F.3d at 795, fn.1. According to the Supreme Court:

(continued...)

held that *de minimus* employment actions are not actionable under Title VII. *White*, 364 F.3d at 795. To avoid lawsuits based on "trivial workplace dissatisfactions," courts have required that plaintiffs prove the existence of an adverse employment action. Otherwise, the Sixth Circuit was concerned that, "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *White*, 364 F.3d at 795 (quoting *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999)).

The court in *White* then discussed the parameters it had placed on the definition of adverse employment action during the twenty (20) years of developing case law on the subject. In *Geisler v. Folsom,* 735 F.2d 991 (6th Cir.1984), the court found that a "general increase of tension in the workplace" is an expected consequence of a claim of retaliation but, without more, it does not constitute an adverse employment action. *White*, 364 F.3d at 796 (citing *Geisler*, 735 F.2d at 996). After *Geisler* was decided in 1984, the next time a case was decided in the Sixth Circuit based upon an adverse employment action was in *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987), when the court held a temporary job reassignment with no loss in pay or benefits was not an adverse employment action for purposes of proving retaliation. *White*, 364 F.3d at 797.

Following *Yates*, it was ten (10) years before the Sixth Circuit issued its "seminal" case on adverse employment action in *Kocsis v. Multi-Car Mgmt., Inc.*, 97 F.3d 876 (6th Cir.1996). *White*, 364 F.3d at 797-98. In *Kocsis*, the parameters of adverse employment action arose in the context of a discrimination claim under the Americans with Disability Act ("the ADA"). In *Kocsis*, the court held that an adverse employment action required "a materially adverse change in the terms of her employment." *White*, 364 F.3d at 797 (quoting *Kocsis*, 97 F.3d at 885). The court in *White* recognized that in *Kocsis*, the Sixth Circuit was relying in part on the test previously formulated by the Seventh Circuit Court of Appeals. *White*, 364 F.3d at 797.[9]

---

[8](...continued)
A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

. . .

A tangible employment action in most cases inflicts direct economic harm. . . .

524 U.S. at 761-62, 118 S.Ct. at 2268-69.

Like the Tennessee Supreme Court in *Barnes* and the Sixth Circuit in *White*, the United States Supreme Court in *Burlington Indus.* favorably cited the Seventh Circuit's formulation of the adverse employment action standard in *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132 (7th Cir.1993).

[9]It is important to note at this juncture that the Sixth Circuit in *White* and *Kocsis* and the Tennessee Supreme Court in *Barnes* adopted the "material and adverse change" definition of adverse employment action relying on precedent from the Seventh Circuit Court of Appeals. Therefore, the Sixth Circuit and Tennessee Supreme Court were, in effect, (continued...)

The court in *White* reiterated that "a mere inconvenience or an alteration of job responsibilities" or a "bruised ego" was not enough to constitute an adverse employment action. *White*, 364 F.3d at 797 (quoting *Kocsis*, 97 F.3d at 886). The Sixth Circuit in *White* quoted extensively and approvingly from *Kocsis* regarding job reassignments stating, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *White*, 364 F.3d at 797 (quoting *Kocsis*, 97 F.3d at 885). The court in *White*, however, noted that a reassignment without loss of pay, rank, or benefits may nevertheless constitute an adverse employment action if it constitutes a demotion evidenced by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation." *White*, 364 F.3d at 797 (quoting *Kocsis*, 97 F.3d at 886).

After discussing the purpose and development of the adverse employment action requirement, the Sixth Circuit in *White* clearly rejected any requirement that an adverse employment action must be an "ultimate employment decision" such as hiring, granting leave, discharging, promoting or compensating. 364 F.3d at 801. The court noted Title VII did not limit its application to ultimate employment decisions. *White*, 364 F.3d at 801. While its prior decision in *Dobbs-Weinstein*, 185 F.3d at 545 (intermediate tenure decisions not adverse employment action under Title VII), may be read to adopt this standard, the Sixth Circuit in *White* joined the majority of other circuits and expressly rejected the "ultimate employment decision" standard. *White*, 364 F.3d at 802.[10]

The Tennessee Supreme Court in *Barnes* likewise rejected the "ultimate employment decision" standard by clear implication. While adopting the "materially adverse" standard, our Supreme Court noted examples of adverse employment actions that fall short of ultimate employment decisions such as loss of title and significant reduction in material responsibilities. *Barnes*, 48 S.W.3d at 707. Therefore, the Sixth Circuit and our Supreme Court are in accord both with adoption of the materially adverse standard and rejection of the ultimate employment decision requirement.

Our Court in *Barnes*, however, did not address how, if at all, this analysis is affected if the allegation concerns retaliation and not discrimination. As we discussed earlier, this is an issue which finds the federal circuits in disagreement. The Sixth Circuit in *White* discussed the varying views

---

[9](...continued)
adopting the same standard previously formulated by the Seventh Circuit.

[10]The Sixth Circuit rejected this requirement for four reasons: (1) it is contrary to the plain meaning of Title VII; (2) the action in this case, suspension without pay for 37 days, is not the trivial matter the requirement to prove adverse employment action was meant to filter; (3) it contravenes the purpose of Title VII; and, (4) it is in tension with Supreme Court holdings that Title VII statutes of limitations are not tolled by internal grievance procedures. *White*, 364 F.3d at 802-03. The court in *White* reasoned *Dobbs-Weinstein* was limited to tenure decisions and declined to discuss to what extent it survives *White*. *White*, 364 F.3d at 802, fn. 7.

on the subject and concluded that adverse employment action bears the same definition and meaning whether discrimination or retaliation is alleged. *White*, 364 F.3d at 799-800.

This conclusion was reached in the context of deciding whether to adopt the position espoused by the EEOC. The Sixth Circuit in *White* rejected the EEOC's request that it adopt a unique standard for adverse employment action for purposes of Title VII retaliation.[11] The EEOC guidelines suggest defining adverse employment action in the context of a retaliation claim to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter a charging party or others from engaging in protected activity." EEOC Compliance Manual § 8 "Retaliation," § 8008 (1998). This is called the "reasonably likely to deter" standard. While the Court in *White* recognized that the "EEOC's proposed definition more overtly incorporates the purpose of Title VII," the Sixth Circuit was concerned that the application of this standard would result in lawsuits based upon trivialities. *White*, 364 F.3d at 799.[12]

Under the EEOC's strictly literal standard, "any form of discrimination" falls under the anti-retaliation proviso of Title VII. *White*, 364 F.3d at 799. The Sixth Circuit concluded that the years of developed case law on what constitutes an adverse employment action has given shape to its meaning within the intent of Title VII. *White*, 364 F.3d at 799. This has the two-fold benefit of filtering trivial matters and preventing trial courts from making case-by-case determinations on what is reasonably likely to deter a person from engaging in activity protected by Title VII. *White*, 364 F.3d at 799. Finally, the Sixth Circuit found it compelling that the same standard apply to both claims of discrimination and retaliation under Title VII. *White*, 364 F.3d at 799.

We agree with the Sixth Circuit that adopting a different standard for adverse employment when proving retaliation may seem appealing at first blush, but is unwise and unwarranted for the reasons discussed by the court in *White*. Furthermore, we also believe that to do so would be a significant departure from the way Title VII and the THRA have heretofore been interpreted. Clearly, our Supreme Court in *Barnes* required that an employment action result in a "material and adverse" change in the terms of employment to be actionable under the THRA provisions prohibiting discrimination. If our Court had eliminated the requirement that it be "material" so that any "adverse change" would be actionable, this interpretation would surely reflect the intent of Title VII and the THRA more closely, *i.e.*, to stop all forms of unlawful discrimination. The court in *Barnes*, nevertheless, required that the change be "material." Therefore, in the context of unlawful discrimination, which is no less abhorrent than retaliation, our Court requires that the result of the discrimination must cause a material and adverse change in employment before it is actionable under

---

[11]The Sixth Circuit also recognized that the Ninth and Seventh Circuits have also "embraced a broad" definition of adverse employment action for purposes of retaliation claims under Title VII that we believe, in effect, places little or no restriction on the type of retaliatory act that would be actionable. *White*, 364 F.3d at 798.

[12]Judge Clay concurred in the result but wrote a separate opinion disagreeing with the majority's rejection of the EEOC standard. According to Judge Clay's concurring opinion, the "reasonably likely to deter" standard is "more consistent with [Title VII's] statutory language and congressional intent, as well as Supreme Court case law." *White*, 364 F.3d at 809 (J. Clay, concurring).

Title VII. If we were to adopt a definition like the one suggested by the EEOC, some employment actions based on race, gender, etc. would not be actionable under the THRA but that same employment action intended as retaliation would be actionable as an adverse employment action.[13] We do not believe that the law intends to act more harshly with regard to retaliation than discrimination.

The purpose of Title VII and the THRA is to prohibit unlawful discrimination. In order to effectively accomplish this laudatory goal, Title VII and the THRA also make retaliation for invoking their protections unlawful. Prohibiting retaliation is the means to the end, rooting out invidious discrimination in the workplace. Since the enactment of Title VII and the THRA, as discussed in *White*, the courts have developed the parameters of an adverse employment action to effectuate the intent of Title VII and the THRA, yet filter out claims based on trivialities, perceived slights, and dissatisfaction. We agree with the Sixth Circuit that the requisite adverse employment action necessary to trigger anti-discrimination laws is the same adverse employment action necessary to trigger the anti-retaliation laws.

As discussed previously, the Tennessee Supreme Court adopted the "material and adverse change" in the terms and conditions of employment definition of adverse employment action in *Barnes* as applicable to a claim of discrimination under the THA. For the foregoing reasons, we believe that the "material and adverse change" definition of adverse employment action found in *Kocsis* and *Barnes* is applicable to a claim of retaliation.

## C. Applying the "Materially Adverse" Standard to the Facts of This Case

The preceding analysis is motivated in large part by trepidations about judicial intervention in the work place, particularly where a Metropolitan Police Department is involved. Law enforcement is after all a 24-hour a day endeavor fraught with danger and stress and requiring strict discipline. Law enforcement, however, is not immune from Title VII or THRA. *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir.2004); *McKenzie v. Milwaukee County*, 381 F.3d 619 (7th Cir.2004). The case is before this Court for review of a jury verdict approved by the trial court. The scope of appellate review is limited.

> This Court on appeal is required to take the strongest legitimate view of the evidence favoring the prevailing party, discard all contrary evidence, allow all reasonable inferences to uphold the jury's verdict and set aside the jury verdict only when there is no material evidence to support it. T.R.A.P. 13(d). *Smith County v.*

---

[13]For example, it has been widely held that a poor evaluation is not a material and adverse change in the terms and conditions of employment actionable under civil rights laws. *White*, 364 F.3d at 795; *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir.1996) (court unable to locate "a single case where an adverse employment ratings alone were found to constitute adverse action"). Therefore, one cannot bring a claim under Title VII or the THRA alleging discrimination if the only manifestation of the discrimination is a poor evaluation. However, under the EEOC's definition, if a poor evaluation is "likely to deter" invoking the provisions of Title VII, then it is unlawful retaliation. We do not believe this was intended by the THRA or our Supreme Court.

*Eatherly*, 820 S.W.2d 366 (Tenn.Ct.App.1991), *cert. denied*, ---- U.S. ----, 112 S.Ct. 1762, 118 L.Ed.2d 424 (1992); *Glover v. Oakwood Terrace Associated II*, 816 S.W.2d 43 (Tenn.App.1991).

*Witter v. Nesbit*, 878 S.W.2d 116, 121 (Tenn.Ct.App.1993).

Under such standard of review, we are not concerned about the weight of the evidence and it is immaterial that the record may contain an abundance of evidence to support a verdict contrary to the findings of the jury. If there is substantial and material evidence in the record to support the verdict, we must affirm the judgment.

There is ample evidence in the record to justify a jury in finding sexual harassment of Sergeant Regnier by Lieutenant Carter and no serious assertion is made in this Court to the contrary.

The determinative question before the Court is whether or not there is substantial and material evidence that would justify the jury in finding by an objective analysis that the transfer of Sergeant Regnier was an adverse employment action. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268-69 (1998); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d at 707. We conclude that there is substantive and material evidence in the record. While the testimony of the plaintiff standing alone might be considered to be purely subjective, the record discloses the testimony of Captain Schiele, Sergeant Gooch and Sergeant Rueff in which they make clear that the training academy was a prestigious assignment with the responsibilities for instruction and supervision. Such evidence is sufficient to present a question of fact for resolution by the jury.

The case is analogous to *De la Cruz v. New York City Human Res. Admin. DSS*, 82 F.3d 16 (2nd Cir.1996). In that case, De la Cruz had been transferred from the Adoption Unit to the Foster Care Unit, and he claimed discrimination because of his Latino national origin and language difficulties related thereto. In rejecting a district court finding to the contrary as to the issue of adverse job action, the Second Circuit Court of Appeals held:

> DSS returned de la Cruz to his normal civil service rank without any cut in pay and transferred him to the Foster Care Unit. He contends that by transferring him from the Adoption Unit to the Foster Care Unit, defendants moved him from an "elite" division of DSS, which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth. Appellees argue that the two units are equal in status. Although de la Cruz's case is in this respect quite thin, the transfer arguably altered the terms and conditions of his employment in a negative way. This is sufficient to satisfy the third prong of the *McDonnell Douglas prima facie* test. *See Day v. Derwinski*, 771 F.Supp. 588 (S.D.N.Y.) ("If an employee's transfer to a different job is motivated by race or age considerations, it is obviously a discriminatory action affecting terms of conditions of employment."), *aff'd*, 953 F.2d 635 (2d Cir. 1991); *Collins v. Illinois*, 830 F.2d 692, 702-04 (7th Cir. 1987) (collecting cases) (lateral transfer involving same pay

and benefits but change in responsibilities held to be an adverse employment action). We therefore conclude that de la Cruz successfully presented a *McDonnell Douglas prima facie* case. The question of whether de la Cruz has been harmed by the transfer would be a question of fact for trial.

*De la Cruz*, 82 F.3d at 21.

Under the facts presented in this case, the question of whether of not the transfer of Sergeant Regnier was an adverse employment action was a question of fact for the jury. *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987); *Tiemeyer v. Quality Publishing, Inc.*, 144 F.Supp.2d 727 (So. Dist. Tex. 2001).

Since substantial and material supports the verdict of the jury, the judgment of the trial court on this issue will be affirmed.

The only other issue presented on appeal challenges the amount awarded by the jury as damages to Plaintiff. While the award of damages in the amount of $150,000 is generous under the facts of the case, we see no adequate basis for disturbing the verdict. The testimony of the plaintiff as to embarrassment, depression, harm to professional reputation and interference with family relationships is not challenged. Indeed, Assistant Chief Faulkner acknowledges that the transfer was an "embarrassing situation" for Plaintiff.

No complaint is made as to the charge to the jury as to damages.

In this case the trial judge did not disturb the jury award of damages by remittitor or otherwise, and we see no reason to disturb the verdict. *Smith v. Shelton*, 569 S.W.2d 421 (Tenn.1978).

The judgment of the trial court is affirmed and the case remanded for such further proceedings as may be necessary. Costs are assessed to Appellant.

_____

WILLIAM B. CAIN, J.